566 F.2d 216
 184 U.S.App.D.C. 324
 Honorable Ronald V. DELLUMS et al.
v.
James M. POWELL, Chief, United States Capitol Police, et al.
Appeal of Jerry V. WILSON, Chief, Metropolitan Police
Department, and District of Columbia.
 No. 75-1975.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 14, 1977.
Decided Aug. 4, 1977.
Rehearing Denied Nov. 14, 1977.
 
 David P. Sutton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellants. C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time the record was filed, also entered an appearance for appellants.
 Warren K. Kaplan, Washington, D. C., with whom Lawrence H. Mirel, Ralph J. Temple, Mary A. McReynolds, and Kenneth V. Handal, Washington, D. C., were on the brief, for appellees.
 Before WRIGHT, TAMM and LEVENTHAL, Circuit Judges.
 Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.
 Dissenting statement filed by TAMM, Circuit Judge.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In this companion case to Dellums v. Powell, --- U.S.App.D.C. ----, 566 F.2d 167, No. 75-1974 (1977) (Dellums I ), we consider appeals taken by Metropolitan Police Chief Jerry V. Wilson and the District of Columbia from a final judgment entered on jury verdicts in the trial below. The facts of this case and its procedural history are set out in Dellums I.
 
 
 2
 On this appeal the District of Columbia defendants have adopted points raised in Chief Powell's brief "to the extent consistent with their non-liability in this case." Appellants' brief at 22. We shall follow suit and adopt Dellums I in answer to those points except as expressly stated herein. While the bulk of the remaining issues in this case pertain to the District of Columbia, we turn first to Chief Wilson's liability.I. LIABILITY OF METROPOLITAN POLICE CHIEF JERRY V. WILSON
 
 
 3
 Chief Wilson was held liable by the jury for false arrest, malicious prosecution, and violation of both Dellums' and the class plaintiffs' First Amendment rights. At trial Chief Wilson did not seek to establish official immunity as a defense, but instead asserted that he was insufficiently involved with the May 5 arrests to support tort liability. He takes the same position here. We disagree with respect to the false arrest and First Amendment claims, but we find no link between Chief Wilson and the prosecution of the class plaintiffs and therefore reverse in part.
 
 
 4
 The record is conflicting with respect to Chief Wilson's role in the events of May 5. Nonetheless, evidence would support a finding that Chief Wilson collaborated on the charge upon which arrests were to be made, and further that he advised Chief Powell against taking additional steps to ensure the effectiveness of dispersal orders at a time when there was some doubt that the orders had been heard.[1] It is also undisputed that Chief Wilson retained personal operational control over all Metropolitan Police officers on the scene and could have withdrawn them had he thought the arrests unjustified.[2] This was sufficient proof of Chief Wilson's independent involvement in the arrest process to make his liability one for the jury to decide.[3]
 
 
 5
 The record will not, however, support Chief Wilson's liability for malicious prosecution. Chief Wilson's involvement other than his personal control and supervision of all Metropolitan Police participating in the arrests was limited to participation in the arrest decision, which to be sure included determination of the charge to be recorded on the field arrest forms as the tentative charge upon which arrestees were to be held. Yet, as far as the record shows Chief Wilson's personal involvement with the events of May 5 ended with determination and recordation of the tentative charge. There is no evidence linking Wilson to the meeting on the evening of May 5 at which Chief Powell and Attorney Zimmerman convinced Attorneys Hannon and Moore to file informations. Indeed, although Wilson was an eyewitness to the events of May 5, there is no mention that he was contacted by the Assistant United States Attorneys at any time or filed a report with them. As we indicated in Dellums I,[4] the critical event triggering liability for malicious prosecution is the filing of an information. Having failed to link Chief Wilson with that decision, plaintiffs did not make out a prima facie case, and the judgment against him insofar as it awards damages for malicious prosecution must be vacated. Because the only basis for holding the District of Columbia liable for malicious prosecution is respondeat superior predicated on Chief Wilson's liability, the judgment against the District of Columbia, insofar as it awards damages for malicious prosecution, must also be vacated.
 
 II. THE DISTRICT OF COLUMBIA
 
 6
 The District was held liable on a respondeat superior theory for all acts for which Chief Wilson was liable and also, as custodian, for violation of arrestees' Eighth Amendment rights. In addition to the defenses of Chiefs Wilson and Powell, the District asserts a number of theories intended to defeat respondeat superior liability and also challenges the sufficiency of the evidence to support Eighth Amendment damages.[5]
 
 
 7
 A. Defenses to Vicarious Liability for False Arrest
 
 1. The Borrowed Servant Doctrine
 
 8
 The law of agency is clear that a person generally the servant of one master can become a "borrowed" servant of another.[6] If the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability for that tort attaches to the borrower and not to the general master.[7] Relying on these propositions, the District argues that the sole master to whom liability can attach for the events of May 5 is the United States, the borrowing master.[8] Whether this is the case is usually a question of fact, generally to be decided by the jury.[9] Here, however, the facts are undisputed, and the only question is whether Chief Wilson and his men were "doing the work" of the United States or of the District of Columbia.[10]
 
 
 9
 We begin by noting that there is a presumption that an actor remains in his general employment[11]
 
 
 10
 so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.
 
 
 11
 There can be no question that Chief Wilson was performing "the business entrusted to him by (his) general employer" when he undertook to keep the peace on Capitol Hill pursuant to an agreement between the Capitol and Metropolitan Police. Consequently, to avoid liability the District must show that the United States had "the power to control and direct (Chief Wilson) in the performance of (his) work,"[12] and liability does not shift to the United States unless it had "authoritative direction and control"[13] over Chief Wilson, which is something more than the power merely to "suggest details or the necessary cooperation."[14]
 
 
 12
 The facts relevant to such proof are these. The Metropolitan Police Department of the District of Columbia is under a general duty to enforce the laws of the United States and of the District of Columbia within the territorial boundaries of the District. However, Congress has also provided for a Capitol Police force with the special obligation to patrol the Capitol Buildings and the Capitol Grounds.[15] This force is under the direction of a three-member Capitol Police Board which consists of the Sergeants-at-Arms of the Senate and House and the Architect of the Capitol.[16] The Capitol Police force is staffed by members of the Metropolitan Police Department, detailed to the Capitol for varying periods of time.[17] In addition, the Capitol Police are entitled to draw on the resources of the Metropolitan Police from time to time to provide necessary reinforcements. Acting under this authority Chief Powell had requested, and Chief Wilson had furnished, members of the Metropolitan Police Special Operations Division for the purpose of keeping order on May 5.
 
 
 13
 The division of authority between the Capitol Police and the Metropolitan Police with respect to the Capitol Buildings and Grounds is set out in 9 D.C.Code § 126 (1973), 40 U.S.C. § 212a (1970).[18] Under that section the Metropolitan Police are authorized to make arrests within the United States Capitol Buildings and Grounds, except that they may not patrol the Buildings or Grounds, nor may they "enter such buildings to make arrests in response to complaints or to serve warrants * * *," except with the consent (or upon request) of the Capitol Police Board. The District argues that the effect of this statute is to put any arrests for violations occurring on the Capitol Grounds under the control of the United States. We disagree.
 
 
 14
 First, the statute does not by its terms limit the authority of the Metropolitan Police to arrest persons violating the laws of the United States or of the District of Columbia when such violations occur in the presence of an officer of the Metropolitan Police who has been requested to patrol the Capitol Grounds.[19] Had the Capitol Grounds statute been violated by the plaintiffs, such a violation would manifestly have occurred in the presence of Metropolitan Police Officers. Thus, with respect to the arrests at issue here, 9 D.C.Code § 126 at most confers authority on the Capitol Police Board to prescribe methods for coordinating police action. Nonetheless, the record read in the light most favorable to the District does indicate that it was understood that Chief Powell would make the initial decision whether to arrest the plaintiffs.[20] Yet it is further undisputed that Chief Powell had no authority to order the Metropolitan Police Officers on the scene to take persons into custody.[21] Only if Chief Wilson agreed that an arrest should be made would he then order the Metropolitan Police Officers to begin the process of taking persons into custody. What the record shows, therefore, is that Chief Powell and Chief Wilson could each veto the other's decision to arrest the plaintiffs. Accordingly, the fact that arrests were made indicates an agreement or joint effort between Chiefs Powell and Wilson, each acting within the scope of his respective master's employment. Where such mutual or joint action exists, the borrowed servant doctrine is inapposite for it conceives of authoritative direction and control vesting in one master to the exclusion of the other, not coordinated action by two masters of their respective servants and liability attaches to both masters. This is true even if the situation is conceptualized as one in which Chief Wilson was acting simultaneously for both the United States and the District of Columbia.[22]
 
 
 15
 2. Inconsistency of Respondeat Superior Liability with Other Federal Laws
 
 
 16
 Although the District's arguments under this heading are somewhat inartfully drawn, it is apparently asking us to limit the scope of the remedy to be implied under Bivens principles to avoid what it sees as an inconsistency between vicarious municipal liability for constitutional torts and policies said to underlie the Federal Tort Claims Act and 42 U.S.C. § 1983. The argument from Section 1983 has been raised only with respect to Eighth Amendment liability, but its logical force cannot be so limited and we consider it here.
 
 
 17
 Arguments similar to the Federal Tort Claims Act point have been consistent losers in the courts of the District of Columbia. At first the District argued that the non-applicability of the Federal Tort Claims Act to the District of Columbia indicated a congressional intent that the District be altogether free from tort liability. This was rejected by this court sitting en banc in Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 53, 425 F.2d 479, 484 (1969). Subsequently, the position taken in Spencer was adopted by the District of Columbia Court of Appeals, also sitting en banc. See Wade v. District of Columbia, 310 A.2d 857, 861-862 (D.C.App.1973). The District next argued that it could not be held liable for the intentional torts of its police officers, pointing to provisions of the Federal Tort Claims Act which excepted false arrest, false imprisonment, and malicious prosecution from the waiver of sovereign immunity otherwise worked by that Act.[23] This argument was rejected by this court in Carter v. Carlson, 144 U.S.App.D.C. 388, 396-397, 447 F.2d 358, 366-367 (D.C.App.1971), rev'd in part on grounds not relevant here, sub nom. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), and, again, was expressly rejected by the District of Columbia Court of Appeals sitting en banc, Wade v. District of Columbia, supra, 310 A.2d at 861-863.[24] Thus as matters now stand there can be no doubt that "the District of Columbia may be sued under the common law doctrine of respondeat superior for the intentional torts of its employees acting within the scope of their employment." Id. at 863.
 
 
 18
 This conclusion does not quite end our inquiry, however. At issue in both Carlson and Wade were common law torts. Here, on the other hand, the action is brought under a Bivens theory and is predicated on a tortious invasion of Fourth, First, and Eighth Amendment rights as well as of interests protected at common law. Nonetheless, this is an irrelevant distinction under the rationale of Spencer, Carlson, and Wade. In those cases the critical question was not the interests protected by tort law, but whether imposition of tort liability would impede " 'the performance of functions calling for the highest degrees of discretion and judgment." Spencer v. General Hospital of the District of Columbia, supra, 138 U.S.App.D.C. at 51, 425 F.2d at 482, quoting Elgin v. District of Columbia, 119 U.S.App.D.C. 116, 120, 337 F.2d 152, 156 (1964). Carlson and Wade confirmed that the arrest function is not one calling for such discretion and judgment and consequently respondeat superior liability would lie.[25] In light of the reasoning in these cases and our holding above that Chief Wilson was not a borrowed servant, we again reject the District's Tort Claims Act argument and hope that, after four strikes, it is now finally and decisively put out.[26]
 
 
 19
 The District's second argument is more troublesome, but it is also unavailing. As we understand the argument, it is that relief in a Bivens action should be styled on the pattern of 42 U.S.C. § 1983. Since the legislative history of Section 1983 was held in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), to preclude suits against municipalities, it is argued it would be anomalous for us to find a right of action under Bivens against the District of Columbia. More troublesome yet is the subsequent decision in Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), where the Court held that a municipality could not be held vicariously liable for Section 1983 damages even though state law quite clearly recognized such liability in common law tort suits.
 
 
 20
 At the threshold it must be recognized that both Bivens and the law of false arrest in the District of Columbia are federal common law doctrines. Both protect constitutional rights coming under the general heading of the Fourth Amendment, although the Bivens action goes farther in recognizing damages for violation of First and Eighth Amendment rights as well. As a consequence of this parallelism, acceptance of the argument proffered by the District would require reversal in both Carlson and Wade as well as in this case. Manifestly, such a wrench in the well settled law of the District of Columbia should not be lightly considered, or imposed without the clearest indication that Supreme Court cases mandate such an outcome.
 
 
 21
 We begin our analysis by noting that Section 1983 does not apply to officers of the District of Columbia. In District of Columbia v. Carter,409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), a unanimous Supreme Court held that the phrase "(e)very person who, under color of any statute * * * of any State or Territory," which describes those subject to Section 1983 liability, does not apply to officers of the District of Columbia since it is neither a state nor a territory within the meaning of Section 1983. The rationale for construing this language narrowly was that the historical situation of the District was such that it was extremely unlikely that the Civil War era Congress intended to address itself to the problem of civil rights in the District:[27]
 
 
 22
 There was no need * * * to create federal court jurisdiction for the District of Columbia. Even prior to 1871, the courts of the District possessed general jurisdiction over both federal and local matters. * * * Thus, the jurisdictional aspects of § 1 of the 1871 Act were entirely superfluous with respect to the District. Moreover, while Congress was unable to exert any direct control over the actions of state officials, it was authorized under Art. I, § 8, cl. 17, of the Constitution to exercise plenary power over the District of Columbia and its officers. * * * And since the District is itself the seat of the National Government, Congress was in a position to observe and, to a large extent, supervise the activities of local officials. Thus, the rationale underlying Congress' decision not to enact legislation similar to § 1983 with respect to federal officials * * * is equally applicable to the situation then existing in the District of Columbia.
 
 
 23
 Because Congress did not address the problem of civil rights in the District, the legislative history of section 1983 obviously does not directly limit the commonlaw-making powers of the courts of the District of Columbia.
 
 
 24
 Nor is the rationale for the congressional exemption of municipalities from Section 1983 liability so persuasive that it should be recognized by the common law as a matter of logic and reason. As indicated in Monroe, Moor, and District of Columbia v. Carter, Congress stayed its hand, not out of any special solicitude for municipalities, but because "the House had solemnly decided that in their judgment Congress had no constitutional power to impose any obligation upon county and town organizations * * *." Monroe v. Pape, supra, 365 U.S. at 190, 81 S.Ct. at 485. Even assuming that this is a correct statement of constitutional principle, it is nonetheless a rationale that simply points nowhere on the issue before us. See U.S.Const., Art. I, § 8, cl. 17.
 
 
 25
 Moreover, if one is casting about through the United States Code for guidance in structuring the common law of respondeat superior, the 1973 amendments to the Federal Tort Claims Act cannot be overlooked.[28] Those amendments modify 28 U.S.C. § 2680(h) so that the federal government is now generally responsible for the intentional torts of its law enforcement officers. The Senate report, while recognizing Bivens as a source of relief for an injured party, stated: "Of course, Federal agents are usually judgment proof so this (Bivens ) is a rather hollow remedy." S.Rep. No. 588, 93d Cong., 1st Sess. 3 (1973); U.S.Code Cong. & Admin.News 1974, pp. 2789, 2790. The Report goes on to indicate that the waiver of sovereign immunity is intended to be "a counterpart to the Bivens case and its progenty (sic )" by making the government "independently liable in damages for the same type of conduct that is alleged to have occurred in Bivens * * *." Id., U.S.Code Cong. & Admin.News 1974, p. 2791. Thus to adopt the District's position on the theory that it removes an anomaly in the law of municipal liability would be to create an anomaly in the application of the only extant congressional statement of policy dealing precisely with the question of the need and wisdom of respondeat superior liability for constitutional torts.
 
 
 26
 For the reasons set out above, we conclude that neither the Federal Tort Claims Act nor Section 1983 requires us to restrict relief for false arrest under a Bivens theory to a narrower compass than under the settled common law.
 
 B. Defenses to Eighth Amendment Liability
 
 27
 Arrests of the plaintiffs commenced between 3:00 and 4:00 P.M. on May 5. Each arrestee was charged with unlawful entry, and field arrest forms were completed to reflect the fact of arrest and the identity of the arresting officer. Persons processed in this way were placed aboard buses and taken to the District of Columbia Coliseum which had been pressed into service as a temporary detention facility. Testimony concerning subsequent events is conflicting in some respects due to the different vantage points of the various observers and fading powers of recollection. Nonetheless, an outline of essentially uncontested facts can be made out.[29]
 
 
 28
 At the Coliseum arrestees were told that they would be taken before a Superior Court judge for arraignment if they would consent to being "processed" into the criminal justice system by having their fingerprints taken and answering a detailed set of questions. Notwithstanding this promise, persons who had completed processing were told to sit in the stands, were moved back and forth from the stands to the floor perhaps a number of times, and were not brought before judges until at the earliest some time in the late morning of May 6.[30] No reason appears in the record why this group was not taken expeditiously before the Superior Court, which was sitting in continuous session at the time.
 
 
 29
 Those who refused to submit to "processing" some 500 persons[31] were segregated within the Coliseum and were detained there until the late afternoon of May 6. At that time all persons who had refused processing were taken to the cellblock in the United States Courthouse. Some 100 persons were left at the Coliseum, awaiting processing or transportation to the Superior Court.
 
 
 30
 Conditions at the Coliseum were unpleasant. No food was available until some time late in the evening of May 5, at which time bologna sandwiches were tossed out into the crowd.[32] Toilet facilities were limited and apparently dirty. Some arrestees were denied permission to use the toilets; others had to wait in long lines. There was testimony that the police harassed women waiting in such lines and made obscene comments to them. Telephones were not reasonably accessible. Although three or four volunteer attorneys may have been allowed into the Coliseum, the police kept other attorneys away, with the result that few arrestees were able to obtain any legal advice before processing. Those who wanted to sleep had to lie down on a concrete floor. The evening was cold and blankets were not available for all, although the magnitude of the shortage is not clear. Finally, there was testimony that the police at one point removed their identifying badges and swept through the crowd of persons who had refused processing, beating them with batons.[33]
 
 
 31
 Conditions of detention at the cellblock in the United States Courthouse were, if anything, worse. Male arrestees were placed into cells so overcrowded that there was insufficient room for all to sit down at once. Although estimates of the numbers of persons placed in each cell vary, it appears to have been over 100.[34] There was only one toilet per cell. Many arrestees were suffering from upper respiratory infections and some from gastroenteritis, yet only limited medical care was available. In the women's section conditions of overcrowding were apparently less severe since the women were not confined to individual cells. Again, attorneys were turned away from the cellblock and finally gained entrance only under orders obtained from various judges of the Superior Court.[35]
 
 
 32
 On these facts the jury found that plaintiffs had been subjected to conditions which were "inhuman and shocking to the conscience,"[36] and which "fell short of * * * basic minimal human standards,"[37] and it awarded each member of the class $500. On appeal the District attacks this judgment on many fronts. It argues that violation of the Eighth Amendment should not give rise to an action for damages, especially against a municipality. It also argues that the damages arising from the conditions of confinement did not fall equally on the class as a whole, but fell not at all on those with a blanket, those with food, those with an attorney, etc. Accordingly, individualization of damages was required, or at least subclasses should have been formed distinguishing those held only at the Coliseum from those held at both the cellblock and the Coliseum. Finally, it argues that the conditions of confinement, though unpleasant, were not so bad as to constitute a constitutional violation.
 
 
 33
 We start with a point not canvassed by the District: whether the damages awarded for Eighth Amendment[38] violations were duplicative of the damages awarded for false arrest and false imprisonment. The jury was charged that, in setting the damages for false arrest and false imprisonment, it could "consider both the length of time that plaintiffs were held and the treatment and conditions of detention to which they were subjected * * *."[39] And, again, that it "should consider as elements of damages any humiliation and the deprivation of any right caused by the loss of liberty."[40] In a supplemental instruction damages to First Amendment interests were distinguished from the right "to be secure in your person and effects, safe from any unlawful interference,"[41] which is protected by the Fourth Amendment and tort law of false arrest. As a consequence of these instructions, a jury must have understood that damages for false arrest, while imprecise, were to be set to compensate for the insult of false arrest, any subsequent humiliation or mistreatment, and the duration of loss of liberty.
 
 
 34
 No separate instruction was given on the measure of Eighth Amendment damages. The jury was told, however, that it could consider whether the police used "excessive and unnecessary physical force * * *, whether or not they were furnished adequate nourishment, whether or not they were furnished with adequate shelter under reasonable conditions, bedding and toilet facilities."[42] It was also told that "you may take * * * into account the length of time during which these persons were subjected to these (inhuman) conditions in assessing damages for (cruel and unusual punishment)."[43] The only fair construction of these directions is that the jury was to award damages for the duration and conditions of detention, including any mistreatment. Accordingly, the jury was in effect told to compensate the plaintiff class twice except insofar as the instructions on false arrest allowed damages to be awarded for the insult of the tortious arrest and the violation of Fourth Amendment rights.
 
 
 35
 Further, we think the District's argument is correct that Eighth Amendment damages could not be given on a uniform basis to the class as a whole. The verdict form used for false arrest, which divided the class into four subclasses on the basis of length of incarceration, and the non-uniform damages returned thereon are ample indications that the class was not unified for purposes of damages. To be sure, the tortfeasor cannot be heard to insist on meticulous accuracy in setting damages. Nonetheless, we think that at a minimum the class should have been divided for Eighth Amendment purposes into those held only at the Coliseum and those held at the cellblock of the Courthouse as well. Whether other subclass divisions suggested by the District are fair or administrable we need not decide.
 
 
 36
 For the reasons stated above, we set aside the judgment awarding damages for cruel and unusual punishment against the District. For this reason, and because our affirmance of the District's liability for false arrest makes the Eighth Amendment claim surplusage in any case, we do not reach the other arguments against Eighth Amendment liability raised by the District on this appeal.
 
 
 37
 C. Defense to All Claims Failure of Class Plaintiffs to Comply with Statutory Notice Requirement
 
 
 38
 The District of Columbia asserts that members of the plaintiff class[44] are barred from recovering damages because they failed to comply with the statutory notice requirements of 12 D.C.Code § 309 (1973). That statute provides:
 
 
 39
 An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Commissioner of the District of Columbia (now, presumably, the Mayor) of the approximate time, place, cause, and circumstances of the injury or damage. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.
 
 
 40
 The District's allegation is not that it received no notice at all, but the technical objection that a letter from the Special Counsel of the American Civil Liberties Union advising the District of class members' claims was legally insufficient to discharge the statutory notice requirement. In part, Special Counsel's letter stated: "On May 5, 1971, between 3:00 and 5:00 p. m., approximately 1200 claimants whom we represent were unlawfully arrested by police officers on the House steps of the Capitol."[45] Attached to the letter was a list of 11 named individuals and their respective addresses. Of these 11 nine were subsequently listed as representative plaintiffs in this suit. Also attached to the letter were the names (without addresses) of some 65 individuals (including the previously named 11) with comments indicating the places where each individual was detained, the duration of his or her detention, and injuries claimed to have been received. The claims of the 65 were stated to be representative of the claims to be made by the class as a whole.
 
 
 41
 The District's position appears to be that Section 309 requires each person asserting the claim against the District (1) to identify himself by name and (2) to write personally to the Commissioner. Support for this position is said to be found, not in Section 309 itself, but in cases construing the Federal Tort Claims Act.
 
 
 42
 Before taking up this argument in detail, it is necessary to stake out some general principles. Section 309 is intended[46]
 
 
 43
 to protect the District of Columbia against unreasonable claims and to assist it in the defense of the public interest where claims are made within the * * * statute of limitations but so long after the events that it is impossible for the District of Columbia to obtain evidence for use in litigation which may result.
 
 
 44
 To this end Section 309 gives "District officials reasonable notice of the accident so that the facts may be ascertained and, if possible, the claim adjusted."[47] Unlike 28 U.S.C. § 2675(a) (1970), the analogous provision of the Federal Tort Claims Act, however, Section 309 does not bar an action until a "claim shall have been finally denied." That is, Section 309, unlike Section 2675(a), does not contain a requirement that administrative remedies be exhausted. Nor is failure to give Section 309 notice a jurisdictional bar to suit if such failure is not asserted as an affirmative defense it is waived.[48] Finally, although Section 2675(a) has been construed narrowly because it constitutes a waiver of sovereign immunity,[49] a similar doctrine of strict construction is not required for Section 309 because the District has no sovereign immunity from liability for the non-discretionary acts of its employees.
 
 
 45
 For the reasons stated above, cases construing the Federal Tort Claims Act and regulations issued thereunder are not helpful in deciding the problem before us. Instead, we must find a solution in the language, purpose, and prior construction of Section 309.
 
 
 46
 We first note that Section 309 does not by its terms require any claimant to file notice personally. Notice may be made through an agent or attorney. And although such an agent or attorney might normally be expected to disclose the name of his principal, the statute does not require giving the claimant's name, but only "the approximate time, place, cause, and circumstances of the injury or damage." Accordingly, if the ACLU Special Counsel were considered to be the agent or attorney of the unnamed class members, the language of Section 309 standing alone would create no bar to class-wide recovery.
 
 
 47
 In this court's last encounter with Section 309 we held that a claimant's obligation to give notice was discharged even though a non-agent of the claimant (the claimant's insurance company) had given notice to the District. See Smith v. District of Columbia, 150 U.S.App.D.C. 126-129, 463 F.2d 962, 965 (1972). Under that decision there would be little question that the ACLU Special Counsel's letter would have the same force as one from an agent or attorney. On remand, however, the District of Columbia Court of Appeals evinced some irritation at our decision and indicated that it felt free to disregard Smith in the future.[50] Therefore, we do not rely on Smith but turn instead to some first principles concerning Rule 23 of the Federal Rules of Civil Procedure.
 
 
 48
 The purpose of the class action procedure established under Rule 23(b)(3) is to create an efficient mechanism for trying claims that share common questions of law or fact when other methods of consolidation are impracticable. To effectuate the purpose of reducing many potential or pending suits to one, the judgment in the class suit even when entered upon settlement runs to all members of the class identified therein and is binding on the class insofar as representation by the named parties has been adequate and due process has otherwise been afforded. As a practical matter, therefore, the named parties are the agents for all and the class attorneys are the attorneys for all. Nothing in the language of Section 309 requires an agent or attorney within the meaning of that statute to be appointed by agreement rather than by operation of law. Consequently, unless the purposes of Section 309 would be contravened by a construction recognizing the quasi-agency relationship created by Rule 23, we think a construction should be adopted recognizing the class attorney as an agent for all class members since this both accords with the practicalities of class litigation and avoids embarrassments to the proper operation of Rule 23.[51]
 
 
 49
 As we have already indicated, the purposes of Section 309 are, primarily, to provide the District an opportunity to investigate claims while the circumstances giving rise to them are fresh and, secondarily, to provide an opportunity for settlement. Because the claims asserted by the class representative must be typical of those of the class as a whole,[52] the claims of any class member should in ordinary course be sufficient to indicate what evidence will be relevant to any defenses the District may have.[53] Rule 23 also provides a mechanism whereby the class representative and his attorney can settle an action for the class as a whole (subject in some instances to the power of individual class members to opt out of any proposed settlement)[54] and we see no reason why this mechanism would not be adequate to meet any legitimate interests the District may have in settling claims against it. Thus there is no conflict at an analytical level between the purposes of Section 309 and a rule recognizing the class lawyer as the attorney or agent of all class members for Section 309 purposes.
 
 
 50
 Nor in the circumstances of this case has there been any prejudice to the District from the Special Counsel's failure to state the names of all 1,200 class members in his letter.[55] The District has not even sought to take discovery from persons named in the letter, let alone those not named. Moreover, had the District wanted the names they were readily available in the police reports of the arrests of May 5. Thus, although we recognize that notice of a claim of false arrest cannot reasonably be found in a police report alone,[56] we think Special Counsel's assertion of a claim coupled with the police reports gave the District all the notice to which it was lawfully entitled.[57]III. CONCLUSION
 
 
 51
 For the reasons stated above, we vacate the judgment entered against the District of Columbia defendants for malicious prosecution and for violation of Eighth Amendment rights. In accord with our mandate in Dellums I, we also vacate the damages awarded for violation of First Amendment rights and remand this facet of the case for a new trial. In all other respects the judgment of the District Court is
 
 
 52
 Affirmed.
 
 TAMM, Circuit Judge, dissenting:
 
 53
 I respectfully dissent for the reasons set forth in my dissenting opinion in Dellums v. Powell, --- U.S.App.D.C. ---, 566 F.2d 167 (1977).
 
 
 
 [1]
 See Tr. 1927-1929, 2461, 820, 2071-2077, 3859-3860; JA 1151-1153, 1478, 645, 1261-1267, 2000-2001
 
 
 [2]
 Chief Wilson testified as follows, Tr. 2681-2682, JA 1640-1641:
 Q Is one of the purposes for Chief Powell maintaining the rank that he does in the Metropolitan Police Department so that he will have authority over other lower ranking Metropolitan Police officers who are assigned on detail to the Capitol Police?
 A No, sir.
 Q It is not?
 A No.
 Q And if he testified to the contrary, that would be incorrect?
 A I would say that would be incorrect: I would say he does not have authority over the Metropolitan Police.
 Q (Does Chief Powell have authority over) those who are detailed temporarily such as the Special Operations Division people on May 5th?
 A No, he did not have control over them.
 Q Did he have authority over them?
 A No.
 Q Did he have authority to tell them to go up and bring people down off the steps?
 A He had authority to make arrests, and they were there to assist him in the fundamentals of making arrests. * * * He did not have authority to issue them commands that Deputy Chief Zanders could not have counter-manded, for example.
 Deputy Chief Zanders, who reported to Chief Wilson, also testified as follows, Tr. 3423, 3424, JA 1829-1830:
 Q Is it fair to say, sir, that you just left it up to Chief Powell as to whether these persons ought to be arrested or not?
 A He made the initial determination, yes.
 Q And you assumed that whatever he said was all right with you, is that right?
 (A) Well, no, I don't think that is a correct statement, that I think what he was doing appeared to me to be a logical line of reasoning to follow and that I would concur with it.
 If I thought the arrests were unreasonable, certainly I wouldn't have concurred with it.
 Q You were not under Chief Powell's authority that day, were you?
 A No, sir.
 
 
 [3]
 No one has challenged the jury instructions on this aspect of the case
 
 
 [4]
 See Dellums v. Powell, --- U.S.App.D.C. ----, at ----, 566 F.2d 167, at 192-193 (No. 75-1974, decided August 4, 1977) (hereinafter cited as Dellums I )
 
 
 [5]
 Chief Wilson has been represented throughout this litigation by members of the staff of the Corporation Counsel for the District of Columbia. See 4 D.C.Code § 143a (1973). The position the District has taken here gives us some pause, since it is potentially adverse to the interests of Chief Wilson insofar as the District's arguments would exonerate the District from joint and several liability with Chief Wilson. We would hope that the Corporation Counsel's office would examine its ethical obligations under the Code of Professional Responsibility, see Ethical Considerations 5-14 to 5-19; Disciplinary Rule 5-105, and consider whether further representation of Chief Wilson is advisable. We note that under § 143a Chief Wilson will be reimbursed by the District for attorney's fees should the Corporation Counsel withdraw
 
 
 [6]
 See, e. g., Denton v. Yazoo & Mississippi Valley R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310 (1932); Balinovic v. Evening Star Newspaper Co., 72 U.S.App.D.C. 176, 113 F.2d 505 (1940); Restatement (Second) of Agency § 227 (1958)
 
 
 [7]
 See, e. g., Denton v. Yazoo & Mississippi Valley R. Co., supra note 6
 
 
 [8]
 The District places heavy reliance on Provancial v. United States, 454 F.2d 72 (8th Cir. 1972). There the court held that two municipal police officers who were also unpaid deputy special officers of the Department of the Interior, Bureau of Indian Affairs, were "employees" of the United States within the meaning of the Federal Tort Claims Act with respect to their actions in arresting an Indian on a reservation. The key fact in making this determination was that the officers would have had no authority to make such an arrest unless they held special officer appointments. By parity of reasoning the District suggests that Metropolitan Police officers who are said to be similarly without general authority to make an arrest on the Capitol Grounds must have been officers of the United States when they made arrests upon the request of the United States. For reasons set out in text infra we reject the District's characterization of applicable law governing arrests at the Capitol. Further, we decline to follow Provancial since it did not purport to examine the borrowed servant doctrine and in addition did not consider whether the general employer of the officers might not be equally liable with the United States
 
 
 [9]
 See Restatement, supra note 6, § 227, comment a, at 501. But cf. Dornan v. United States, 460 F.2d 425 (9th Cir. 1972) (semble )
 
 
 [10]
 See Denton v. Yazoo & Mississippi Valley R. Co., supra note 6, 284 U.S. at 308-309, 52 S.Ct. 141
 
 
 [11]
 Restatement, supra note 6, § 227, comment b, at 501; accord, Dornan v. United States, supra note 9, 460 F.2d at 428
 
 
 [12]
 Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 S.Ct. 252, 53 L.Ed. 480 (1909); accord, Denton v. Yazoo & Mississippi Valley R. Co., supra note 6, 284 U.S. at 309-310, 52 S.Ct. 141
 
 
 [13]
 Standard Oil Co. v. Anderson, supra note 12, 212 U.S. at 222, 29 S.Ct. 252
 
 
 [14]
 Id
 
 
 [15]
 9 D.C.Code § 126 (1973), 40 U.S.C. § 212a (1970); see note 18 infra
 
 
 [16]
 Id
 
 
 [17]
 See 9 D.C.Code § 126a (1973)
 
 
 [18]
 This provision was amended in 1973, but the language relevant here was not changed. See 40 U.S.C. § 212a (Supp. V 1975)
 
 
 [19]
 The legislative history indicates that Congress intended to allow the Metropolitan Police to make arrests on the Capitol Grounds when they were in pursuit of an offender and when they were asked to patrol on the Grounds, but not when acting on complaint or warrant. See S.Rep.No.1709, 79th Cong., 2d Sess. 5 (1946):
 There are, of course, many instances (not barred by the requirement of consent of the Capitol Police Board) in which it is necessary for the Metropolitan Police to be able to make arrests within the Capitol Grounds, such as when pursuing traffic offenders; also to be able to make arrests within the Capitol Buildings; for example, when detailed to the Capitol at the request of the Capitol Police Board on occasions such as visits of the President, and other important events.
 
 
 [20]
 See testimony of Deputy Chief Zanders, quoted at note 2 supra
 
 
 [21]
 See testimony quoted at note 2 supra
 
 
 [22]
 See Restatement, supra note 6, § 226
 
 
 [23]
 (Sovereign immunity is not waived as to) (a)ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights
 28 U.S.C. § 2680(h) (1970). This subsection was amended in 1973 to remove the above exception as to "assault, battery, false imprisonment, false arrest, abuse of process, (or) malicious prosecution," 28 U.S.C. § 2680(h) (Supp. V 1975); however, this amendment applies only to claims arising after the date of the amendment.
 
 
 [24]
 The en banc opinion in Wade does not clearly disclose that the District in that case made both arguments set out in text. The panel opinion in that case does show this, however. See Graves v. District of Columbia, 287 A.2d 524, 525 (D.C.App.1972)
 
 
 [25]
 See Carter v. Carlson, 144 U.S.App.D.C. 388, 396, 447 F.2d 358, 366 (1971), rev'd in part on other grounds, sub nom. District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); Wade v. District of Columbia, 310 A.2d 857, 860 (D.C.App.1973) (en banc ). Of course, both Carter and Wade recognized that the arrest function involved discretion in the ordinary sense but not discretion in the policymaking sense, which is the interest protected by municipal immunity
 
 
 [26]
 The history of District of Columbia liability in tort is traced in Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 50, 425 F.2d 479, 481 n.2 (1969) (en banc ). The most recent decision rejecting the District's claims of sovereign immunity is that of the District of Columbia Court of Appeals in Wade v. District of Columbia, supra note 25
 
 
 [27]
 District of Columbia v. Carter, supra note 25, 409 U.S. at 429-430, 93 S.Ct. 602, 608 (footnotes and citations omitted)
 
 
 [28]
 The amendments are contained in § 2 of Pub.L. No. 93-253, 88 Stat. 50 (1973). Section 2680(h) as amended is codified at 28 U.S.C. § 2680(h) (Supp. V 1975)
 
 
 [29]
 The District of Columbia does not appear to have challenged on cross-examination any of the testimony offered concerning conditions of detention. On appeal the District has generally conceded the accuracy of this testimony or has been unable to cite record support for any of its contrary assertions
 
 
 [30]
 Persons were delayed both in leaving the Coliseum and in being arraigned once they were in the vicinity of the Superior Court. For example, one arrestee who was processed almost immediately upon arrival at the Coliseum, Tr. 857, JA 662, was apparently taken from the Coliseum some time on May 6, see Tr. 858, JA 663, but was not arraigned until 5:00 A.M. on May 7, Tr. 867, JA 672. Another witness testified that she had finished processing about 4:30 P.M. on May 5, but was not taken from the Coliseum until 6:00 P.M. the following day and did not gain her release until some five hours later. Tr. 974-975, JA 739-740. See also Tr. 620, 887, 954, JA 460, 681, 733
 
 
 [31]
 The record is not clear on how many persons were moved to the cellblock. In Sullivan v. Murphy, 156 U.S.App.D.C. 28, 42, 478 F.2d 938, 952, cert. denied, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), facts were presented which tended to indicate that 500 persons were so detained. See also note 35 infra
 
 
 [32]
 Tr. 541, 621, 954, JA 386, 461, 733. There was also mention of fried chicken and soft drinks being made available by the National Guard present in the Coliseum. Tr. 621, JA 461
 
 
 [33]
 There may have been more than one such incident. One beating episode apparently occurred when police decided to move those who had refused processing to the cellblock at the United States Courthouse. At that time some demonstrators apparently went limp and locked arms. It appears the police beat such persons in an attempt to get them to break the holds. See Tr. 753-754, 770, JA 584-585, 601. Whether such force was excessive is not clear
 
 
 [34]
 One witness estimated that as many as 140 persons were placed in each cell. Tr. 757, JA 588
 
 
 [35]
 After a personal tour of the cellblock on the evening of May 6-7, Superior Court Judge Belson entered an order requiring an immediate 75% reduction of the numbers of persons being held. In his order Judge Belson stated:
 In consideration of the inspection by the Court and the testimony taken, the Court finds that the approximately 600 persons presently detained prior to arraignment in the facility in question are being held under conditions which grossly violate the minimum standards properly applicable even to temporary detention facilities. The Court finds that serious conditions of overcrowding exist at the facility and that from a standpoint of health and sanitation the facility is totally inadequate for the purpose for which it is being used. It is concluded that the petitioners are experiencing cruel and unusual punishment and irreparable injury by reason of their being held in the detention facility described above.
 D.C. Public Health Ass'n v. Superintendent, D.C. Jail, No. SP49-7 (D.C.Superior Court May 7, 1971).
 
 
 [36]
 Tr. 25, JA 2307
 
 
 [37]
 Tr. 26, JA 2308
 
 
 [38]
 We note that a number of circuits have reached the conclusion that the Eighth Amendment's cruel and unusual punishment clause does not apply to pretrial detainees. See Rhem v. Malcolm, 507 F.2d 333, 337 (2d Cir. 1974); Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976); Anderson v. Nosser, 456 F.2d 835, 838 (5th Cir.) (en banc ), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972). These cases have nonetheless granted relief under various theories of due process and equal protection. For convenience, we will continue to refer to the cruel and unusual punishment claims as Eighth Amendment claims, but we do not intend thereby to resolve the issue of the applicability of the cruel and unusual punishment clause to pretrial detainees
 
 
 [39]
 Tr. 21, JA 2303
 
 
 [40]
 Tr. 32, JA 2314
 
 
 [41]
 Tr. 64, JA 2346
 
 
 [42]
 Tr. 26, JA 2308
 
 
 [43]
 Id
 
 
 [44]
 The District does not now assert a similar defense against Congressman Dellums and, therefore, we have no occasion to consider whether the notice given the District was sufficient as to him
 
 
 [45]
 The letter reads in full:
 November 4, 1971
 The Honorable Walter Washington
 District Building
 Washington, D.C. 20004
 Dear Mr. Commissioner:
 On May 5, 1971, between 3:00 and 5:00 p. m., approximately 1200 claimants whom we represent were unlawfully arrested by police officers on the House steps of the Capitol. The arrests were made without probable cause, and people were subjected to excessive force, conversion of property, and other abusive actions in connection with the arrests, were held in unlawful detention and other conditions that were overcrowded, unsanitary, and otherwise inhumane, were denied the right to counsel and to communicate with families and friends, were compelled to undergo unlawful processing, including fingerprinting and photographing, and were held for prosecution for purposes of harassment, in bad faith and with no hope of obtaining valid convictions. As a result of these wrongs, the people involved have been denied their constitutional rights and have sustained injuries and damages in unliquidated amounts.
 Accompanying this letter is a list of names of individuals claimants who suffered injuries that are typical of those sustained by the group of claimants as a whole.
 /s/ Yours truly,
 /s/ Monroe H. Freedman
 /s/ MONROE H. FREEDMAN
 /s/ Special Counsel
 
 
 [46]
 H.R.Rep. No. 2010, 72d Cong., 2d Sess. 1 (1933); see, e. g., Miller v. Spencer, 330 A.2d 250, 251 (D.C.App.1974)
 
 
 [47]
 H.R.Rep. No. 2010, supra note 46, at 2
 
 
 [48]
 F. W. Woolworth Co. v. Stoddard, 156 A.2d 229, 231 (D.C.Mun.App.1959)
 
 
 [49]
 See, e. g., Commonwealth of Pennsylvania v. National Ass'n of Flood Insurers, 520 F.2d 11, 19-20 (3d Cir. 1975), and cases cited therein
 
 
 [50]
 See District of Columbia v. Smith, 297 A.2d 787, 789 (D.C.App.1972)
 
 
 [51]
 See American Pipe & Const. Co. v. Utah, 414 U.S. 538, 551-559, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). See also Note, Developments in the Law Class Actions, 89 Harv.L.Rev. 1318, 1448-1454 (1976)
 
 
 [52]
 Rule 23(a)(3), Fed.R.Civ.P
 
 
 [53]
 See generally Developments, supra note 51, 89 Harv.L.Rev. at 1448-1454
 
 
 [54]
 Rule 23(e), Fed.R.Civ.P.; see Developments, supra note 51, 89 Harv.L.Rev. at 1552-1576
 
 
 [55]
 Had prejudice arisen from failure to disclose the names of claimants, a result different from that here might be required. But see note 57 infra
 
 
 [56]
 In Brown v. District of Columbia, 304 A.2d 292 (D.C.App.1973), the District of Columbia Court of Appeals held that an arrest report was defective as § 309 notice because it did not disclose any claim of injury. See 304 A.2d at 293
 
 
 [57]
 In Hurd v. District of Columbia, 106 A.2d 702 (D.C.Mun.App.1954), Mrs. Hurd sued the District for personal injuries arising from a fall on a sidewalk. Her letter of notice gave an inaccurate location for the place of the fall. Later, however, Mrs. Hurd's attorney recognized the mistake and sent a letter to the District's Inspector of Claims correcting the location of the fall. The court held that the second letter, although not sent to the Commissioner of the District as required by § 309, was nonetheless sufficient to correct inaccurate information given in the proper notice. See 106 A.2d at 704-705. Here, proper notice was given to the District of the claims of 1,200 putative class members, see note 45 supra, except that the names were left out. We see no reason why, under Hurd, the arrest reports which the District had had in its possession since May 5, 1971 could not supplement the notice filed with the District, even assuming arguendo that names were required to be disclosed by § 309. Surely the filed arrest forms are "report(s) in writing by the Metropolitan Police Department, in regular course of duty" as described in § 309. Brown v. District of Columbia, supra note 56, is not to the contrary since the court held there that an arrest record was defective solely because it did not give notice that a claim for false arrest was being asserted. Here, the letter from ACLU Special Counsel filled that void
 Because we conclude that 12 D.C.Code § 309 can be read consistently with Rule 23, Fed.R.Civ.P., we have no need to consider the separate argument that § 309 was never intended to apply to constitutional actions. We note, however, that the District Court has concluded that § 309 is no bar to a constitutional action, see Order of April 8, 1976 in Lively v. Cullinane, D.D.C.Civil Action No. 75-0315. This decision rests heavily on Judge Leventhal's holding in Sullivan v. Murphy, supra, 156 U.S.App.D.C. at 61-63, note 31, 478 F.2d at 971-973, that a District of Columbia Code provision, 4 D.C.Code § 137 (1973), did not bar equitable relief of constitutional violations where there was no indication that Congress intended to reach such a result.