Kenneth M. BROWN, Appellant,

Riggie A. Lott and All Other Inmates That Have Been Subject to the Conditions in the Adjustment Unit

v.

UNITED STATES of America, et al.

No. 81–2083.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Nov. 7, 1983.

Decided Sept. 4, 1984.

As Amended Oct. 2, 1984.

Bork, Circuit Judge, dissented and filed opinion, in which Tamm, Wilkey, and Starr, Circuit Judges, joined.

Anne Shere Wallwork, Washington, D.C. (appointed by this court), for appellant.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., was on the brief, for appellee Dist. of Columbia. Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., entered an appearance for appellee Dist. of Columbia.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA, and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT, in which Chief Judge SPOTTSWOOD W. ROBINSON III, and Circuit Judges WALD, MIKVA, HARRY T. EDWARDS, GINSBURG, and SCALIA join.

Dissenting opinion filed by Circuit Judge BORK, in which Circuit Judges TAMM, WILKEY and STARR join.

J. SKELLY WRIGHT, Circuit Judge:

On October 19, 1979, Yusaf Na'im Salahuddin (then known as Kenneth M. Brown), an inmate of the District of Columbia's reformatory at Lorton, Virginia, filed suit in the United States District Court for the District of Columbia. The suit alleged that conditions in the reformatory's "Adjustment Unit," where the plaintiff had previously been incarcerated, had unconstitutionally deprived inmates of adequate food, clothing, sanitary conditions, cell space, and educational, religious, legal, and rehabilitative services, and had failed to protect them from physical assault by guards and other inmates. The suit originally sought declaratory and injunctive relief as well as damages, and it named as defendants a

number of District of Columbia and federal officials and the District of Columbia itself. Here, we are concerned only with the claim seeking damages from the District of Columbia (the District).[1]

The District Court, on September 2, 1981, granted a summary judgment motion filed by the District. The part of the District Court's order that concerns us is its holding that the notice of claims provision in the District of Columbia Code, 12 D.C.Code § 309 (1981), applied to plaintiff's action for unliquidated damages against the District.

In relevant part, 12 D.C.Code § 309 provides:

An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Commissioner [Mayor] of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. * * *

Because plaintiff had not filed any notice that would comply with 12 D.C.Code § 309, the District Court granted summary judgment as to the damage action. Plaintiff appealed and argued that Section 309 did not apply to federal causes of action such as his constitutional tort action.

While the appeal was pending, a panel of this court decided *McClam v. Barry*, 697 F.2d 366 (D.C.Cir.1983), which held that Section 309's six-month notice of claims requirement *does* apply to federal damage actions against the District. In light of *McClam*, a panel of this court affirmed the District Court's grant of summary judgment with respect to the damage claims against the District, 704 F.2d 1293. On May 19, 1983, this court granted reconsideration *en banc* and vacated the judgment of the panel.

We now hold that *McClam v. Barry* was in error in holding that the six-month notice of claims provision of Section 309 applies to causes of action that, like this constitutional tort claim,[2] are creations of federal law.

**1.** This action was brought directly under the Constitution pursuant to the theory of *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Although after the filing of this action Congress amended 42 U.S.C. § 1983 to include actions taken under color of District of Columbia law, *see* Pub.L. No. 96–170, § 1, Dec. 29, 1979, 93 STAT. 1284, prior to that amendment § 1983 did not apply to D.C. government actions. *See District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). That a constitutional tort claim based on events before the amendment could be based on *Bivens* is clear. *See, e.g., Doe v. District of Columbia*, 697 F.2d 1115 (D.C.Cir.1983); *Tarpley v. Greene*, 684 F.2d 1 (D.C.Cir.1982).

**2.** Although this action is only under a *Bivens* theory, the broader phrase "constitutional tort" will usually be used in this opinion to account for actions under 42 U.S.C. § 1983. Both sides agree that for purposes of the issues in this case there are no relevant differences between the two types of actions and that precedents from § 1983 law are important to the analysis of this case. "The bodies of law relating to the two forms of litigation have been assimilated in most * * * respects." *Doe v. District of Columbia, supra* note 1, 697 F.2d at 1123.

At times, precedents from one body of law have not been applied to the other. *See, e.g., Carlson v. Green*, 446 U.S. 14, 24 n. 11, 100 S.Ct.

1468, 1474 n. 11, 64 L.Ed.2d 15 (1979). The case for such an assimilation, however, is especially strong in a case such as appellants', where the federal entity is, in effect, a local government that is locally administered (*i.e.*, the District of Columbia). First, local governments are usually subject to 42 U.S.C. § 1983 suits, and thus to apply § 1983 precedents to *Bivens* actions against the District is simply to treat the District like other municipalities. This seems reasonable where there are no federal interests arguing for different treatment. Second, Congress has, in its subsequent amendment to § 1983, *see* note 1 *supra*, made the determination that the District should be treated like other municipalities for purposes of constitutional tort litigation. Third, some of the reasons that have in the past argued for treating *Bivens* actions outside the District differently from § 1983 actions related to the national character of the federal entities challenged in the *Bivens* actions. In *Carlson*, for example, the Court refused to apply a state survival of actions rule to a *Bivens* action against the administrators of the Federal Bureau of Prisons. Among the reasons given by the Court was the need for a uniform federal rule to govern a centrally administered nationwide federal bureaucracy that otherwise might order its affairs to take advantage of differences in state laws. Such concerns seem much less relevant where the federal entity is a local government whose entire operation is subject to the same "local" law.

## I. THE DECISION IN *McClam v. Barry*

To resolve the issue whether 12 D.C. Code § 309 should apply to federal causes of action, the *McClam* court correctly focused its inquiry on two possible approaches. First, it asked whether Congress, when it enacted Section 309, meant for that section to apply to federal causes of action. 697 F.2d at 369. But it also realized that even if Congress had no such explicit intent the section might still be applicable to federal actions because federal law does at times borrow state legal provisions to complement federal law. Thus, as a second inquiry *McClam* asked whether application of Section 309 was "supported by the rationale of the rule * * requiring application of local statutes of limitations to claims based on federal laws that specify no limitations period." *Id.* at 370.

We agree that these inquiries are the proper ones. That we make two inquiries reflects the existence of two available rationales that could justify applying Section 309 to federal causes of action: First, that Congress may have intended Section 309 itself to alter the normal rules applicable to federal causes of action, and second, that those normal rules themselves may take account of Section 309 just as they take account of certain other provisions of local law.

The first inquiry thus rests entirely on a rationale of actual congressional intent: Congress, the author of national legislation, may at times intend that its District of Columbia legislation modify national policies with respect to the District of Columbia. The second inquiry begins with an alternative view of congressional intent: Congress, which is constitutionally responsible for providing a comprehensive body of local law for the governance of the District of Columbia, may see itself as passing local legislation akin to that which any other local legislature might pass. The rationale for applying the provision then rests on established judicial practices concerning when state or local provisions of law should be used as rules of federal law. This approach is in part a judicial positing of congressional intent and in part an examination of the provision's role in state and local law. For example, the rule that federal law borrows from local law when there is no federal statute of limitations in part "rests on deference to the local balancing of interests embodied in statutes of limitations—a balancing of the interest in allowing the prosecution of valid claims against the interest in preventing the prosecution of claims that, because of delay, cannot be fairly litigated." *Id.* at 370 (*citing Board of Regents v. Tomanio*, 446 U.S. 478, 487, 100 S.Ct. 1790, 1796, 64 L.Ed.2d 440 (1980); *Johnson v. Railway Express Agency*, 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)).

The *McClam* court apparently concluded that either of the two inquiries would justify the applicability of Section 309 to federal actions. In answer to the first, it concluded that "the D.C.Code provision was an intentional limitation [by Congress] on the right to bring even federal causes of action for damages against the District of Columbia." 697 F.2d at 369. In answer to the second, *McClam* concluded that "[t]he same balancing of interests lies behind the D.C.Code notice provision" as lies behind traditional state statutes of limitations, *id.* at 370, and that Section 309 should thus be borrowed so that federal law as applied in the District of Columbia would reflect that local balance.

While we agree that *McClam* made the right inquiries, we disagree with each of its answers.

## II. CONGRESSIONAL INTENT AND 12 D.C.CODE § 309

12 D.C.Code § 309 was enacted by Congress in 1933, at least partially in response to this court's *en banc* decision and recommendation in *District of Columbia v. Leys*, 63 F.2d 646, 648 (D.C.Cir.1932) (on rehearing), *cert. denied*, 289 U.S. 756, 53 S.Ct. 787, 77 L.Ed. 1500 (1933). *See* Pub.L. No. 72–385, 47 STAT. 1370 (1933). The language and purposes of the statute were broad. As *McClam* points out, the language contains no limitations regarding the types of

actions covered. 697 F.2d at 369. Similarly, the Act's stated purposes—to provide the District an opportunity to investigate claims when all evidence is still fresh, to allow the District to seek out early settlement of meritorious claims, and generally to protect the District's revenues from unreasonable suits—would certainly be fulfilled all the more by giving the Act as broad a reading as its language would allow. *See id. See generally* H.R.REP. No. 2010, 72d Cong., 2d Sess. (1933) (describing purposes of Act). We do not, however, find these factors conclusive; other factors argue for a narrower view.

Nothing in the history of the Act indicates that Congress ever considered the question whether the Act should apply to federal actions. The *Leys* opinion, which urged the Act's passage, concerned a "garden variety" tort suit against the city; the plaintiff had slipped on a defective sidewalk and brought suit long after the event. Similarly, the report accompanying the bill described the problem to be rectified as that of "[n]umerous instances * * * in which notice of injury as a result of alleged defective sidewalks, or other conditions, were brought to the [city's] attention * * * by a filing of a suit for damages more than two years after the alleged injury occurred." H.R.REP. No. 2010, *supra*, at 1. The conclusion that Congress was motivated by the municipality's potential liability for everyday torts is strengthened by the fact that a provision was added which allowed written Metropolitan Police reports to fulfill the notice requirement of the Act. Such reports would have been commonly associated with street accidents and similar events.

None of this discussion is meant to imply that the scope of Section 309 should be limited to the sorts of "garden variety" negligence actions described above. We do not question the subsequent cases that have given it a far broader application. *See, e.g., Breen v. District of Columbia,* 400 A.2d 1058 (D.C.C.A.1979) (applying Section 309 to intentional torts). The point is, however, that there is no evidence that Congress envisioned itself to be acting as

other than a local legislature protecting a municipality from the threat of excessive common law tort liability. Not only was the problem that Congress discussed one of routine municipal administration—with no reference to the "unique" or "national" character of the District—but in its legislative history the Act is explicitly analogized to similar legislation passed in the states to govern other municipalities.

The analogy to municipal notice provisions existing throughout the nation was raised by this court when it first suggested congressional passage of the already introduced notice provision. The *Leys* opinion argued that "[p]rovisions of this character appear to be included in [the] bill recently introduced into [Congress], and are to be found in city charters in Virginia and elsewhere." 63 F.2d at 648. Congress similarly equated the provision with laws commonly passed by state governments. The report accompanying the bill pointed out that "[s]imilar statutes are in effect in 32 States" and sought to justify the length of time allowed for giving notice by comparing it to the provisions in effect in "other jurisdictions." H.R.REP. No. 2010, *supra,* at 2. All of this persuades us that Congress simply saw itself to be acting as a local legislature when it passed Section 309.

▪ Under the Constitution, Congress has authority to act as the local legislature for the District of Columbia, and thus Congress frequently enacts legislation applicable only to the District and tailored to meet local needs. Absent evidence of contrary congressional intent, such enactments should be treated as local law, interacting with federal law as would the laws of the several states. *See, e.g., Sullivan v. Murphy,* 478 F.2d 938, 971–973 (D.C.Cir.), *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973). Therefore, we do not interpret the Congress that passed this apparently local legislation as having intended that it should burden federal causes of action any more than would an analogous state ordinance.

### III. FEDERAL "BORROWING" DOCTRINE

#### A. An Overview of the Doctrine

The central claim of the District is that even if 12 D.C.Code § 309 is best understood as purely local law, courts should "borrow" it as a rule of federal law when the District is sued. The doctrine of federal borrowing of local law is well established. To effectuate the goals of federal law, courts, when faced with deficiencies in federal schemes, look to other sources of law to "borrow" appropriate provisions. As the Supreme Court has said: "There will often be no specific federal legislation governing a particular transaction * * *. But silence * * * in federal legislation is no reason for limiting the reach of federal law * * *. [T]he inevitable incompleteness [of federal enactments] means that interstitial federal lawmaking is a basic responsibility of the federal courts." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973).

One of the principal sources of law that courts turn to to fill the deficiencies in federal schemes is state law. For example, where a federal action contains no statute of limitations courts ordinarily look to state law as a possible source of federal law. *See generally DelCostello v. Int'l Bhd of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Where it would be consistent with the federal policies underlying the action, courts borrow the most appropriate state limitations provisions. *See Burnett v. Grattan*, —— U.S. ——, ——, 104 S.Ct. 2924, 2928, 82 L.Ed.2d 36 (1984); *Johnson v. Railway Express Agency, supra*, 421 U.S. at 462, 464, 95 S.Ct. at 1721, 1722. Indeed, courts have borrowed not only the limitations provisions themselves, but also state tolling policies, which "are * * * integral part[s] of a complete limitations policy" and which thus give the limitations provisions their meaning under state law. *Tomanio, supra*, 446 U.S. at 488, 100 S.Ct. at 1797. State provisions other than statutes of limitations and tolling policies, but analogous to them, have also been borrowed to fill gaps in

federal law, *see, e.g., Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (borrowing state survivorship of actions rule), though the practice has been less common and the courts have been somewhat less consistent. *See generally* P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 829 (2d ed. 1973) (apart from statutes of limitations and their incidents, "[t]he authorities are extremely sparse" concerning the extent to which state " 'procedural' and 'quasi-procedural' rules[,]" particularly those "which may affect outcome[,]" should be borrowed); *id.* at 199–200 (Supp.1981) (discussing the inconsistent results in cases concerning the extent of borrowing state procedural provisions other than "statutes of limitations and their incidents"); *see also* Hill, *State Procedural Law in Federal Nondiversity Litigation*, 69 HARV.L.REV. 66, 91–94 (1955) (reasons for applying state procedural law are usually weak when dealing with rules other than statutes of limitations).

These borrowing practices are the result of at least two considerations. First, as mentioned above, they reflect the fact that federal law is frequently "deficient" in that it does not supply the complete legal framework necessary to the fair adjudication of federal causes of action. Although federal law may establish rights, and rights of action for the vindication of those rights, federal law does not always include all the " 'procedural' or 'quasi-procedural' " elements that are generally considered necessary to the fair litigation of its causes of action. Where these are absent, it certainly cannot be assumed that the interests normally embodied in those elements were intended to play no part in the federal scheme. *See DelCostello, supra*, 462 U.S. at ——, 103 S.Ct. at 2287 (where there is no statute of limitations, "we do not ordinarily assume that Congress intended that there be no limit on actions at all"); *Tomanio, supra*, 446 U.S. at 488, 100 S.Ct. at 1797 (the absence of a statute of limitations cannot be understood as placing policies of

repose in disfavor); *see also* Hill, *supra,* 69 HARV.L.REV. at 91–92. Thus the courts are faced with the necessity of formulating some rule to fill the deficiency in the federal scheme and thereby to effectuate federal policy. In this context, the borrowing doctrine is the alternative to judicial formulation of a uniform federal rule.

The borrowing doctrine also rests on deference to the balances that local law has struck with respect to the interests normally embodied in the elements necessary to, but absent from, the federal scheme. *See Johnson v. Railway Express Agency, supra,* 421 U.S. at 463–464, 95 S.Ct. at 1721–1722 ("[A]ny statute of limitations * * * reflects a value judgment concerning the point at which the interests in * * * protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. * * * In borrowing a state period of limitation * * *, a federal court is relying on the State's wisdom * * *."); *McClam v. Barry, supra,* 697 F.2d at 370. With respect to certain statutes, Congress has explicitly codified· this borrowing doctrine. *See* 42 U.S.C. § 1988 (1982) (courts should look to state law when federal law is not "suitable to carry [the policies of the Reconstruction Era civil rights statutes] into effect" or when those statutes "are deficient in the provisions necessary to furnish suitable remedies," so long as rules of state law are not inconsistent with policies embodied in federal law); *Burnett v. Grattan, supra,* — U.S. at —, 104 S.Ct. at 2928; *Johnson v. Railway Express Agency, supra,* 421 U.S. at 464, 95 S.Ct. at 1722 (linking 42 U.S.C. § 1988 to general federal borrowing practices); *see also Tomanio, supra.* But see Eisenberg, *State Law in Federal Civil Rights Cases: The Proper Scope of Section 1988,* 128 U.PA.L.REV. 499 (1980) (giving very different interpretation of Section 1988). Yet neither when codified nor when used as a "fallback rule of thumb" of federal common law, *DelCostello, supra,* 462 U.S. at — n. 12, 103 S.Ct. at 2287 n. 12, is the doctrine an absolute one to be mechanically applied. State law rules are borrowed out of the need to effectuate federal policies in the face of incomplete federal law, and they are not borrowed if they would incorporate into federal law balances of interests that are inconsistent with the policies underlying the federal action. *See* 42 U.S.C. § 1988; *Tomanio, supra,* 446 U.S. at 487, 100 S.Ct. at 1796. As the Supreme Court has recently stated, "Federal courts must be ever vigilant to insure that application of state law poses 'no significant threat to any identifiable policy or interest.' " *Burks v. Lasker,* 441 U.S. 471, 479, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979) (*quoting Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)).

■ As this overview of borrowing doctrine shows, the issue presented by the doctrine is neither how to incorporate into federal law as much state law as a federal action will tolerate, nor how best to further state policies and goals in the litigation of a federal action. The issue is how to best effectuate the federal policies embodied in a federal action when the action does not itself supply the complete legal framework necessary to the effectuation of those policies. Because the practice of borrowing presupposes a need to fill a deficiency in the federal scheme, a court must first look to see if there is indeed such a deficiency. *See Cohen v. Board of Education,* 536 F.Supp. 486, 493–495 (S.D.N.Y.1982).

### B. *The Issue of Deficiency*

■ This case can be resolved on this point. We cannot view the federal scheme for adjudicating constitutional torts as deficient for lack of a notice of claims provision. Nor can we view the District of Columbia's notice of claims provision as simply embodying certain interests which are not explicitly provided for in the federal scheme, but which nonetheless should be treated as part of that scheme. In short, there is no deficiency in the federal scheme that would lead us to look to 12 D.C.Code § 309 as a possible source of federal law for effectuating federal policies. "State law is to be resorted to in resolving an issue if, and only if, federal law is deficient,

and if, and only if, state law 'is not inconsistent with the constitution and the laws of the United States.'" *Jaworski v. Schmidt*, 684 F.2d 498, 500 (7th Cir.1982) (*quoting* 42 U.S.C. § 1988), *cert. denied*, 460 U.S. 1015, 103 S.Ct. 1258, 75 L.Ed.2d 485 (1983).

Most of the cases involving the limiting of federal causes of action by borrowing state procedural rules have involved the question of whether to borrow state statutes of limitations, tolling policies, or other rules of response that clearly establish the point at which a cause of action ends. *See, e.g., Tomanio, supra* (tolling policies); *Robertson, supra* (survival of action rule); *Johnson, supra* (statutes of limitations). The courts have emphasized the frequent absence of statutes of limitations from federal enactments, the inherently legislative balancing of interests that goes into the determination of a particular period of limitation (making the judiciary particularly unsuited to make such a determination), and the indispensability of such statutes to our ideals of justice. This last point has been well understood from the beginnings of our federal system. For example, in 1805 Chief Justice John Marshall recognized the indispensability of statutes of limitations when he borrowed a federal criminal statute's limitations period and applied it to a federal civil action for debt brought under a statute containing no limitations provision.

> [I]t deserves some consideration, that if [the law] does not limit actions of debt for penalties, those actions might, in many cases, be brought at any distance of time. This would be utterly repugnant to the genius of our laws. In a country where not even treason can be prosecuted after a lapse of three years, it could scarcely be supposed that an individual would remain for ever liable to a pecuniary forfeiture.

*Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805). The point was more recently emphasized by Justice Rehnquist when he argued for borrowing state statutes of limitations and tolling policies.

> On many prior occasions, we have emphasized the importance of the policies underlying state statutes of limitations. [They] are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system. Making out the substantive elements of a claim for relief involves a process of pleading, discovery, and trial. The process of discovery and trial which results in the finding of ultimate facts for or against the plaintiff by the judge or jury is obviously more reliable if the witness or testimony in question is relatively fresh. Thus in the judgment of most legislatures and courts, there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the fact-finding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious. * * *

*Tomanio, supra*, 446 U.S. at 487, 100 S.Ct. at 1796.

By logic and tradition, the absence of a statute of limitations is an egregious gap in a cause of action. Whatever the source of a cause of action, *some clear end* to one's liberty to commence suit is necessary. Most decisions concerning the borrowing of state law that would burden federal actions have arisen from this need to borrow provisions, such as statutes of limitations, tolling policies, and survival rules, that serve the exclusive purpose of defining that point where the right to maintain a cause of action ends.[3]

---

**3.** There is another class of cases in which state law is used to supplement federal enactments. It involves federal enactments in fields that have traditionally been left to state regulation. In those cases, where there is no background of federal law—and indeed where the regulated relationships may even be relationships that are the creations of state law—Congress is not assumed to have ignored those preexisting state legal relationships. In that sense, federal enactments can be assumed to be "incomplete" or "deficient," and state law is commonly borrowed to fill the "gaps." *See, e.g., Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) (borrowing state law provision regarding corporate directors' power to terminate

The *McClam* opinion concluded that "[t]he same balancing of interests lies behind the D.C.Code notice provision" as lies behind statutes of limitations—"a balancing of the interest in allowing the prosecution of valid claims against the interest in preventing the prosecution of claims that, because of delay, cannot be fairly litigated." 697 F.2d at 370. Similarly, the District argues that there are no significant differences between a traditional statute of limitations and the D.C.Code's notice provision. Although it is true that Congress was clearly concerned with ensuring the freshness of evidence when it passed 12 D.C.Code § 309, that does not resolve the issue. At a minimum, we must note that a notice provision has a very different relationship to a cause of action than that of a statute of limitations, tolling provision, or survival rule.

No one disputes that if 12 D.C.Code § 309 were applied to a federal cause of action, it would be wholly independent of relevant limitations, tolling, and survival provisions, which would all remain applicable. While these latter provisions all operate to define the point of repose, after which expectations become settled, the notice of claims provision does something different. Of course, if it is not complied with, and there are no grounds for waiver, it bars an action, and thus it acts to create settled expectations; but this is simply a penalty for noncompliance. The provision's function is to compel notice so that the municipal defendant may investigate early, prepare a stronger case, and perhaps reach an early settlement. The need to apply traditional provisions of repose (statutes of limitations, tolling provisions, and survival

rules) remains unchanged, since the notice provision has a purpose that is quite distinct.

It is important to our inquiry that a notice of claims provision supplements rather than replaces a traditional statute of limitations and operates in a quite different manner than does such a statute of limitations. Before examining the exact policies served by the provision, we must emphasize that its borrowing does not have the same support in tradition that the borrowing of a statute of limitations would have. This point does not simply rest on a belief in an inherent value to tradition; it rests instead on the fact that borrowing may be explained as a judicial positing of congressional intent. Because statutes of limitations are such universally familiar procedural aspects of litigation, and because they are so generally understood as essential to a fair scheme of litigation, the judiciary is safe in assuming that Congress intended (or at least would have intended) to limit all congressionally created causes of action by statutes of limitations. In other words, the judiciary can safely look at the absence of a limitations provision as a deficiency.[4]

The judiciary is on less secure ground, however, when it limits statutory or common law causes of action with procedural rules embodying interests that are not as universally understood to be as essential to fair litigation as are the repose interests embodied in traditional statutes of limitations. The absence of such rules in the cause of action cannot as easily be termed a deficiency. Indeed, the ground is less secure even when the rules embody interests similar to those embodied in traditional

derivative suits, even where cause of action is federal statute: " 'Corporations are creatures of state law,' and it is state law which is the font of corporate directors' powers." *Id.* at 478, 99 S.Ct. at 1837 (*quoting Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2090, 45 L.Ed.2d 26 (1975)). This case does not involve the issue of how to supplement federal legislation of limited scope enacted in a field that has traditionally and primarily been subject to pervasive state regulation. Thus the logic of those cases cannot be the basis of assuming a deficiency in federal law in this case.

4. If the cause of action is a federal common law action implied by the Constitution, no different analysis is called for. Unless there are reasons to do otherwise, courts should shape federal common law to conform to the general structure of analogous federal statutory litigation. *Cf. Doe v. District of Columbia, supra* note 1, 697 F.2d at 1123 (the law surrounding *Bivens* actions has for the most part assimilated the law surrounding 42 U.S.C. § 1983 actions).

statutes of limitations but implement those interests in a less universally accepted manner. While the borrowing of state statutes of limitations is supported by both the need for some limitations provision and the tradition of borrowing from state law to supply it, in most other instances the application of local procedural rules that would significantly inhibit the ability to bring federal actions will be neither as reasonable nor as necessary. *Accord* Hill, *supra,* 69 HARV.L.REV. at 91–94.[5]

## C. The Role of 12 D.C.Code § 309 in Local Law

■ With these considerations in mind, we turn to the District's contention that 12 D.C.Code § 309 should, in spite of its differences, be analogized to a local statute of limitations and thus be adopted as a federal rule of law. To evaluate the argument, we must turn to the role that the provision plays in the local legal scheme—both its method of operation and the interests it serves. In addition to examining the provision's legislative history, which we have done above, we should also examine the District of Columbia courts' understanding of the provision. *See* 11 D.C.Code § 102 (1981) (District of Columbia Court of Appeals is "highest court of the District of Columbia"); *Thompson v. United States,* 548 F.2d 1031, 1035 (D.C.Cir.1976) (D.C.

5. The dissent's understanding of when a deficiency exists in federal law does not appear to incorporate a consideration of the necessity or reasonableness of the type of state rules to be borrowed. According to the dissent, "federal law should be considered 'deficient' and courts should turn to the law of the forum state if federal law does not cover the issue." Dissenting opinion at 1512. This approach apparently contemplates that the simple absence of any provision of state law from federal law automatically implies a deficiency in federal law, regardless of whether or not such a provision is in any way necessary or helpful to or even consistent with the execution of the federal law in question. This interpretation is unsupported by existing case law. *See, e.g., Robertson v. Wegmann,* 436 U.S. 584, 588, 98 S.Ct. 1991, 1994, 56 L.Ed.2d 554 (1978) (noting that federal law is "deficient" when it is " 'unsuited or insufficient "to furnish suitable remedies" ' ") (*quoting Moor v. County of Alameda,* 411 U.S. 693, 703, 702, 93 S.Ct. 1785, 1792, 36 L.Ed.2d 596 (1973), *quoting* 42 U.S.C. § 1988). *See also Board of Regents v. Tomanio,* 446 U.S. 478, 483–484, 100 S.Ct. 1790, 1794–1795, 64 L.Ed.2d 440 (1980) (borrowing state statute of limitations after referring to absence of such statute in federal law as a "void" *and* after citing previous cases that had determined that such an absence warranted borrowing). In essence, existing case law appears to find a deficiency only where the particular type of provision in question is deemed necessary and reasonable. (This determination in turn assumes, though this point is almost too obvious to require statement, that the type of provision is consistent with the federal law at issue. *Cf. infra* at 1508–1509.) Statutes of limitations, for example, though not directly indicated as necessary by the existence of a federal cause of action, are so universal that their necessity and reasonableness have been accepted.

The dissent also appears to depart from existing case law in its analysis of the appropriate-

ness of the particular provision at issue, which it undertakes after having determined, using the analysis described in the previous paragraph, that a deficiency exists in the federal scheme in question. Relying on the recent Supreme Court case of *Burnett v. Grattan,* the dissent concludes that the notice provision at issue in this case is appropriate for borrowing because of its lack of "functional differences" with the federal cause of action here. Dissenting op. at 1516. The dissent's interpretation of *Burnett,* however, does not appear to accurately reflect that case. In *Burnett,* the Supreme Court determined that a particular state statute of limitations was not appropriate for borrowing for two reasons. First, the statute in question was inappropriate when applied to the federal cause of action in the case because it "fail[ed] to take into account practicalities that are involved in litigating" the type of federal claim at issue. *Burnett v. Grattan,* —— U.S. ——, ——, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984). Second, the statute was inappropriate because the goals it was designed to achieve were inconsistent with the objectives underlying that cause of action. *Id.* at ——, 104 S.Ct. at 2930–2931. The dissent's purported application of *Burnett* involves a curious reading of this determination. First, the dissent focuses solely on the "practicalities" part of the analysis and neglects to consider the policy part at all. Second, in performing the "practicalities" part of the analysis, the dissent notes that because none of the particular hindrances to appropriateness mentioned in *Burnett* appear to be present in this case the provision is appropriate. *See* dissenting op. at 1516–1518. Yet the Supreme Court in *Burnett* found simply that where those particular hindrances were present, a provision was not appropriate to borrow; it did not find that the absence of those hindrances would prove appropriateness. Thus the dissent's analysis of the appropriateness of borrowing the notice provision is both incomplete and erroneous.

Court of Appeals rather than this court is final expositor of local law).

In spite of the District's insistence that the provision is closely akin to a statute of limitations, quite a different image emerges from the opinions of the District of Columbia Court of Appeals. That court has refused to view the provision as similar to a statute of limitations. *See Gwinn v. District of Columbia,* 434 A.2d 1376 (D.C. C.A.1981).

> 1. *12 D.C.Code § 309 as a condition precedent to the accrual of rights against the municipality.*

In *Gwinn,* the District of Columbia Court of Appeals decided that Section 309's notice provision was not subject to those tolling policies that would apply to a statute of limitations. The court's reasoning is particularly significant. The court argued that compliance with the provision was a condition precedent to the very existence of any " 'right of action' or 'entitlement to maintain an action' " for tort damages against the municipality. *Id.* at 1376. This distinguished the provision from a statute of limitations and made the statute of limitations' tolling principles inapposite because they "presuppose[ ] that a 'right of action' exists and that the claimant is 'entitled to maintain' that action." *Id.* Unless notice is given, according to *Gwinn,* no right of action ever accrues. In effect, under *Gwinn,* compliance with the provision is considered an element in any damage cause of action against the municipality.

The way *Gwinn* characterized the operation of the notice provision makes it more difficult to view it as filling a deficiency in federal law. State law is not usually thought to add elements to federal rights of action. A court may safely posit that federal lawmakers, when setting out the elements of a cause of action, do not usually intend that there should forever remain a remedy available once those elements are established. *See Tomanio, supra,* 446 U.S. at 488, 100 S.Ct. at 1797. It is much more difficult to assume that those law-makers, when they set out the elements of a federal cause of action, would normally intend for additional and unstated elements to be also considered necessary, and for state law to be consulted to supply those missing (yet necessary) elements of the federal action. In particular, nothing in federal borrowing doctrine leads us to believe that state law can precondition the accrual of federal rights of action. *Cf. Campbell v. Haverhill,* 155 U.S. 610, 618, 15 S.Ct. 217, 220, 39 L.Ed. 280 (1895) (arguing that a federally created right of action can be limited by a state statute of limitations because "statutes of limitations affect the remedy only, and do not impair the right"); *Bomar v. Keyes,* 162 F.2d 136, 140–141 (2d Cir.1947) (Hand, J.) (statutes of limitations are normally treated as going to the remedy and not as a condition to the federal right of action), *cert. denied,* 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947); *see also Cohen v. Board of Education, supra,* 536 F.Supp. at 493–495.

> 2. *12 D.C.Code § 309 as a condition on the District's waiver of municipal tort immunity.*

When we examine the policy reasons given by the District of Columbia Court of Appeals to support its construction and formal characterization of Section 309, we find that those reasons also undermine the argument that it would fill a deficiency in federal law just like a traditional statute of limitations. The District of Columbia Court of Appeals has consistently understood the notice requirement of Section 309 to be a condition placed on the partial waiver of the District's sovereign immunity. *See Gwinn, supra,* 434 A.2d at 1378 & n. 3; *Kelton v. District of Columbia,* 413 A.2d 919, 920 (D.C.C.A.1980); *Wilson v. District of Columbia,* 338 A.2d 437, 438 & n. 2 (D.C.C.A.1975). As a matter of local common law the District has waived most of its traditional municipal tort immunity, although it still retains some. *See generally Chandler v. District of Columbia,* 404 A.2d 964, 965 & n. 2 (D.C.C.A.1979) (discussing continued validity of sovereign im-

munity in District of Columbia law); *Spencer v. General Hospital,* 425 F.2d 479 (D.C.Cir.1969) *(en banc)* (discussing history of immunity, abandoning "governmental-proprietary" test for defining immunity, and adopting "discretionary function" test for defining immunity); *Elgin v. District of Columbia,* 337 F.2d 152 (D.C.Cir.1964) (same). The view that 12 D.C.Code § 309 was a condition on the waiver of municipal immunity has influenced the District of Columbia Court of Appeals' construction of that provision. *See, e.g., Gwinn, supra,* 434 A.2d at 1378.

To the extent that 12 D.C.Code § 309 accommodates plaintiffs' interests and notions of municipal immunity, it does not correspond to any deficiency in the federal law, nor indeed would it be well-fitted to filling any such deficiency. The role in constitutional tort litigation of state law immunities in general, and municipal immunities in particular, has been the subject of substantial federal law. In *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Supreme Court held that "[b]y including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed." *Id.* at 647–648, 100 S.Ct. at 1413–1414 (footnote omitted). Moreover, the Court explicitly discussed the two principal common law theories of municipal immunity—each of which has, at different times, been the

basis of the District's municipal immunity—and rejected the proposition that either could limit suits under 42 U.S.C. § 1983. 445 U.S. at 644–650, 100 S.Ct. at 1412–1415. Even before *Owen* clarified the content of federal law, the Seventh Circuit, in an opinion by Judge (now Justice) Stevens, held that the issue of tort immunity was controlled by uniform federal law rather than by borrowing from state law. *Hampton v. City of Chicago,* 484 F.2d 602, 607 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974). *Hampton* was quoted with approval and its conclusion was apparently adopted in *Owen's* discussion of the inapplicability of municipal immunity concepts to Section 1983 litigation. 445 U.S. at 647 n. 30, 100 S.Ct. at 1413 n. 30. *See also Jaworski v. Schmidt, supra,* 684 F.2d 498 (law of immunities relating to constitutional torts is federal law unaffected by state provisions). To import notions of municipal immunity from District of Columbia law into federal civil rights law would be to undermine a federal policy rather than to fill a deficiency in the federal scheme.

## IV. CONCLUSION

■ For the reasons discussed above, we overrule the panel opinion in *McClam.* We also note that outside of this circuit the overwhelming majority of federal and state courts that have confronted the issue of borrowing notice of claims provisions have reached the same result that we now reach.[6] Joining these courts, we hold that appellant's noncompliance with 12 D.C.

---

**6.** Cases refusing to borrow notice provisions include: *Rosa v. Cantrell,* 705 F.2d 1208, 1221 (10th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983); *Brandon v. Board of Educ.,* 635 F.2d 971, 973 n. 2 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981); *Willis v. Reddin,* 418 F.2d 702 (9th Cir.1969); *Davis v. Krauss,* 478 F.Supp. 823, 825 (E.D.N.Y.1979); *Williams v. Posey,* 475 F.Supp. 133 (M.D.Ga.1979); *Paschall v. Mayone,* 454 F.Supp. 1289, 1298 (S.D.N.Y. 1978); *Perrote v. Percy,* 452 F.Supp. 604 (E.D. Wis.1978); *Luker v. Nelson,* 341 F.Supp. 111, 118 (N.D.Ill.1972); *Williams v. Horvath,* 16 Cal.3d 834, 129 Cal.Rptr. 453, 548 P.2d 1125 (1976); *Overman v. Klein,* 103 Idaho 795, 654

P.2d 888, 892 (1982); *Doe v. Ellis,* 103 Wis.2d 581, 309 N.W.2d 375 (1981). For a case holding that a notice provision should be borrowed, *see Mills v. County of Monroe,* 59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456, *cert. denied,* —— U.S. ——, 104 S.Ct. 551, 78 L.Ed.2d 725 (1983). *Mills* seems to be the only case outside of this jurisdiction holding that a notice provision should be borrowed. The *Mills* opinion, however, partially rests its decision on the unusual flexibility of the relevant New York provision; it was subject to waiver by the court if to waive would promote equity or the action would vindicate "the public interest." Thus, even *Mills* would not support the District's case here.

Code § 309 cannot bar his federal claims. Accordingly, it was error to grant the District's motion for summary judgment.

*Reversed and remanded.*

BORK, Circuit Judge, dissenting:

I adhere to the result reached in *McClam v. Barry*, 697 F.2d 366 (D.C.Cir.1983), for two reasons. First, the majority's application of section 12–309 to common law torts ignores the extremely broad language and purpose of Congress. Second, the majority improperly interprets the meaning of the "deficiency" requirement of the federal borrowing doctrine, and fails to consider the appropriateness of borrowing this notice-of-claims provision.

## I.

That Congress did not specifically consider whether the Act should apply to constitutional torts does not compel the majority's conclusion. "[I]t is no bar to interpreting a statute as applicable that 'the question which is raised on the statute never occurred to the legislature.'" *Eastern Airlines, Inc. v. CAB*, 354 F.2d 507, 511 (D.C.Cir.1965), *quoting* B. Cardozo, *Nature of the Judicial Process* 15 (1921). Both the language and purpose of section 12–309 expressly cover the constitutional claims at issue.[1] As *McClam* points out, "the language of the provision is unquestionably broad; it cannot be read to contain even a hint that it applies only to common-law claims." 697 F.2d at 369. As the majority concedes, "the Act's stated purposes—to provide the District an opportunity to investigate claims when all evidence is still fresh, to allow the District to seek out early settlement of meritorious claims, and generally to protect the District's revenues from unreasonable suits—would certainly be fulfilled all the more by giving the Act

as broad a reading as its language would allow." Maj. op. at 1502. *See Dellums v. Powell*, 566 F.2d 216, 230 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Pitts v. District of Columbia*, 391 A.2d 803, 807 (D.C.1978). *See generally* H.R.Rep. No. 2010, 72d Cong., 2d Sess. (1933) ["House Report"]. These purposes "would be significantly undercut by the exclusion from its coverage of all federal or even all constitutional claims for damages." *McClam*, 697 F.2d at 369. Here, the majority removes from the notice provision all "causes of action that ... are creations of federal law." Maj. op. at 1500.

While acknowledging that the words and purpose of the Act are broad enough to cover the case before us, the majority nevertheless limits the applicability of the inclusive language of the Act to common law torts. This limitation is in no way prescribed, or even suggested, by the language of section 12–309. It also conflicts with the expansive reading the District of Columbia courts have given the statute.[2] The majority bases this limitation on the lack of "evidence that Congress envisioned itself to be acting as other than a local legislature protecting a municipality from the threat of excessive common law tort liability." Maj. op. at 1502. In fact, the legislative history that the majority claims supports its conclusion speaks to an entirely different issue. Although the House Report did "explicitly analogize[ ] [the Act] to similar legislation passed in the states to govern other municipalities," maj. op. at 1502, that analogy was employed solely for the purpose of defending the period chosen "within which the notice must be filed." House Report at 2. It was not used to justify the bill, nor was it raised in the context of a discussion of the scope of the

---

1. Although at oral argument counsel for the District of Columbia seemingly abandoned this theory, and said that the District's case depended solely on application of the federal borrowing doctrine, I do not believe that I am bound by those representations. Counsel was not abandoning a claim but rather a legal justification for a claim. I agree with the majority that

*McClam* correctly focused on two inquiries. Maj. op. at 1501.

2. The majority does not question those cases, although it says they have given the statute a "far broader application" than was originally intended. Maj. op. at 1502.

Act's coverage. The words of the statute are plain, and they clearly cover this case. Absent any evidence on this question, we should not speculate whether Congress was acting in a "local" or "national" capacity. In any case, the common characterization of congressional legislation for the District as local or national has little utility here. Whatever usefulness such terms have when a court examines a question such as whether the equal protection clause requires that Congress' legislation for the District be uniform with its legislation for the nation, *see, e.g., United States v. Thompson,* 452 F.2d 1333, 1339–41 (D.C. Cir.1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972), such categories do not assist in determining whether Congress intended a notice provision to apply to all causes of action that are covered by the words Congress used.

There seems to be at work here a canon of construction or a line of jurisprudential reasoning with which I am unfamiliar. The majority's position rests upon a distinction between common law tort actions for liquidated damages and actions arising out of federal law for unliquidated damages. But there is no indication whatever that Congress had in mind any such distinction. 1933 was not a year so remote in legal antiquity that Congress must be presumed not to have understood that damage claims could be premised on federal law. Neither then nor at any time since has Congress shown any signs of regret that the plain language it used covered more than common law torts.

That section 12–309 had its genesis in congressional reaction to a recommendation by this court in a case involving a common law tort in no way suggests that the statute's broad language, which covers all damage claims, must be confined to common law torts. Reasoning from the

particular to the general is hardly unheard of in law, and it is certainly a form of reasoning not to be denied to legislatures by courts. Had section 12–309 had its origin in a reaction to a case involving a federal cause of action, it is very much to be doubted that the majority would deny the law any application to common law tort claims. If I am right, this must mean that the court is proceeding on an unarticulated and undefended premise which holds that damage claims arising out of federal law are, in some way left wholly undefined, so different from common law claims that a statute reading on both can be applied only to the latter. I do not know what argument could be constructed to support that conclusion. None appears in the majority's opinion. This court simply says to Congress: you said it; your policy requires it; but we can't believe you meant it.

In the end, all the reader learns is that the majority is unwilling to read "injury or damage" as used in section 12–309 to include "injury or damage" arising out of federal law torts as well as common law torts. This is unfortunate, because the Supreme Court has made clear that, for the purposes of applying local procedural rules,[3] there is nothing "peculiar to a federal civil rights action that would justify special reluctance in applying state law." *Johnson v. Railway Express Agency,* 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). *See McClam v. Barry,* 697 F.2d at 373. *A fortiori,* there should be no reluctance to apply a statute enacted by Congress itself.[4]

In sum, the language of section 12–309 covers all torts, whether common law or constitutional. "[T]he absence of any legislative history in point should not outweigh the words of the statute." *See Souder v. Brennan,* 367 F.Supp. 808, 812–13 (D.D.C.

---

**3.** *See infra* pp. 1503–1505 for a discussion of the similarities between notice-of-claims provisions and statutes of limitations.

**4.** This inference is further supported by Congress' express provision of similar notice requirements in various federal civil rights laws. *See, e.g.,* 42 U.S.C. § 2000e–5(e) (1982) (requir-

ing notice to EEOC of employment discrimination claim within 180 days of accrual of claim, or within 300 days in certain cases); 29 U.S.C. § 626(d)(1) (1982) (requiring notice to Secretary of Labor of age discrimination claim within 180 days of accrual of claim).

1973), *quoted in Breen v. District of Columbia,* 400 A.2d 1058, 1061 (D.C.1979). Moreover, the statute's purpose is undercut by limiting it to constitutional torts, much as its efficacy would have been significantly diminished had it not been extended to intentional torts. *Breen,* 400 A.2d at 1062–63.

## II.

Although Congress' express language ought to be dispositive of the issue before us, the same conclusion—that section 12–309 bars the claims before us—is required if we treat the statute as analogous to state law and apply federal borrowing doctrine. That doctrine calls for the following inquiry. We first examine federal law to determine if it is deficient. If federal law does not cover the issue, we must then borrow the law of the forum state, if appropriate, unless that law is inconsistent with federal law. *Burnett v. Grattan,* —— U.S. ——, ——, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984); 42 U.S.C. § 1988 (1982). Since I think that federal law is deficient and that section 12–309 is both appropriate for this claim and is not inconsistent with any of the relevant federal policies identified by the Supreme Court, I believe section 12–309 should be "borrowed" and applied here.

## A.

The majority considers federal law to be "deficient" only if it does not supply a rule that is a "universally familiar procedural aspect[ ] of litigation," maj. op. at 1506,[5] and if federal law does not provide rules that "clearly establish the point at which a cause of action ends." *Id.* at 1505. The

5. Even accepting this incorrect view of the law, it is not at all clear that notice-of-claims provisions do not fall into this category. *See infra* pp. 1514–1516.

6. Although these cases concerned claims brought under civil rights statutes rather than under the Constitution, the Court's reasoning should apply equally to *Bivens*-type actions, which rest on the same policies as those behind 42 U.S.C. § 1983, the statute in issue in *Chardon v. Soto,* 462 U.S. 650, 103 S.Ct. 2611, 2616, 77

deficiency requirement, however, does not admit of such a niggardly definition. The cases establish that federal law should be considered "deficient" and courts should turn to the law of the forum state if federal law does not cover the issue. Deficiency, then, has been, and should be, used only in the sense of a "void" in federal law. *Board of Regents v. Tomanio,* 446 U.S. 478, 483–84, 100 S.Ct. 1790, 1794–1795, 64 L.Ed.2d 440 (1980). Applying this correct standard, there is clearly a void or deficiency in the common law of constitutional torts that section 12–309 can fill.

The majority engages in an inquiry far different from the one the Supreme Court has specified.[6] In *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), for example, the Court borrowed a state survivorship statute which caused the action to abate, and refused to create a federal common-law rule of survivorship. The Court expressly stated that "[r]esolution of this question turns on whether the state statute is 'inconsistent with the Constitution and laws of the United States.'" 436 U.S. at 585, 98 S.Ct. at 1992, *quoting* 42 U.S.C. § 1988 (1976). Unlike the majority here, the Court did not engage in a lengthy inquiry as to whether federal law supplied "the complete legal framework necessary to the fair adjudication of federal causes of action." Maj. op. at 1503. Nor did the Court consider whether the state survivorship statute is a "universally familiar procedural aspect[ ] of litigation" or whether it is "generally understood as essential to a fair scheme of litigation." *Id.* at 1506.

In *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440

L.Ed.2d 74 (1983), *Board of Regents v. Tomanio,* 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), and *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978).

Also, as the majority points out, Congress has codified the borrowing doctrine for civil rights statutes in 42 U.S.C. § 1988 (1982), and the Supreme Court has linked this statute to general federal borrowing practices. *Johnson v. Railway Express Agency,* 421 U.S. at 464, 95 S.Ct. at 1722.

(1980), the Supreme Court also borrowed state law and applied a New York rule precluding tolling of the statute of limitations while an independent action was being pursued. Again, the Court's definition of deficiency is very different from that of the majority:

Congress did not establish a statute of limitations or a body of tolling rules applicable to actions brought in federal court under § 1983—a void which is commonplace in federal statutory law. When such a void occurs, this Court has repeatedly "borrowed" the state law of limitations governing an analogous cause of action.

*Tomanio*, 446 U.S. at 483–84, 100 S.Ct. at 1794–1795 (footnote omitted).

More recently, in *Chardon v. Soto*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983), the Supreme Court affirmed the application of a local tolling rule providing that the statute of limitations begins to run anew when the tolling period ceases. The Supreme Court began its analysis by stating that "[t]he federal civil rights statutes do not provide for a specific statute of limitations, establish rules regarding the tolling of the limitations period, or prescribe the effect of tolling." *Id.* at 2615. Citing 42 U.S.C. § 1988, the Court noted that "Congress ha[s] plainly instructed the federal courts to refer to state law when federal law provides no rule of decision for actions brought under § 1983." 103 S.Ct. at 2616.

In *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court borrowed a state statute of limitations, which precluded the plaintiff from bringing a suit under 42 U.S.C. § 1981, one of the civil rights statutes. The Court looked to the limitations period provided by state law "[s]ince there is no specifically stated or otherwise relevant federal statute of limitations for a cause of action under § 1981." 421 U.S. at 462, 95 S.Ct. at 1721.

The majority also suggests that courts should consider federal law deficient only when it does not provide rules "that clearly

establish the point at which a cause of action ends." Maj. op. at 1505. Aside from the fact that notice provisions do define such a point, this new requirement is inconsistent with the case law. Federal courts have not, in fact, limited the incorporation of state law to only those rules that state when a cause of action ends. When Congress has not provided a rule of decision for an action brought under section 1983, federal courts have gone on to fashion a range of "remedial details," often by borrowing state law. As the Supreme Court has stated:

"The implied absorption of State statutes of limitation within the interstices of the federal enactments is a *phase of fashioning remedial details where Congress has not spoken* but left matters for judicial determination within the general framework of familiar legal principles."

*Runyon v. McCrary*, 427 U.S. 160, 180, 96 S.Ct. 2586, 2599, 49 L.Ed.2d 415 (1976), *quoting Holmberg v. Armbrecht*, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) (emphasis added).

One example of a "remedial detail" with no bearing on the point at which a cause of action ends is the availability of punitive damages. For example, in *Duchesne v. Sugarman*, 566 F.2d 817, 821 n. 2 (2d Cir. 1977), the Second Circuit held that, under state law, the plaintiff's claim for punitive damages did not survive, although the claims for compensatory and nominal damages did. The court was thus using state law to determine, not the end of the underlying cause of action, but the nature and amount of the remedy. *See Jones v. Hildebrant*, 191 Colo. 1, 6–8, 550 P.2d 339, 343–45 (1976) (en banc), *cert. dismissed as improvidently granted*, 432 U.S. 183, 97 S.Ct. 2283, 53 L.Ed.2d 209 (1977) (rebutting plaintiff's contention that the only part of a state's wrongful death statute that should be incorporated into federal law is the right to sue, not the state law of damages); *James v. Murphy*, 392 F.Supp. 641, 645 (M.D.Ala.1975) (federal court borrowed state wrongful death act which gave recovery for punitive damages only; the court

denied the motion to dismiss and allowed plaintiff, who had sought compensatory damages only, to amend).

The federal law contains no notice-of-claims provision applicable to constitutional torts. The District of Columbia has a notice-of-claims provision applicable to all torts because Congress thought it required by sound policy. That demonstrates a deficiency in the common law of constitutional torts.

That should be the end of the matter. But if a still stronger showing of a deficiency is wanted, that is available as well. I will demonstrate from, 1., the ubiquity of such provisions, 2., their overlap in policy and function with statutes of limitations, and, 3., the special need of municipalities for such provisions, that there can be no doubt that borrowing the District's notice provision cures a deficiency in federal law.

### 1.

Because they serve a special function, notice provisions commonly apply to claims against government. For that reason, there are fewer notice provisions than there are statutes of limitations, which apply to all claims. But within the category of claims where notice provisions are useful, they are found very frequently indeed. As the majority states, at the time the bill was passed, "[t]he report accompanying the bill pointed out that '[s]imilar statutes are in effect in 32 states.'" Maj. op. at 1502, *quoting* House Report at 2. Today, such statutes are found in "most jurisdictions" and notice is "commonly required." Annot., 51 A.L.R.2d 1132 (1957); 63 C.J.S. *Municipal Corporations* § 923, at 340 (1950). *See* Annot., 59 A.L.R.3d § 2[a], at 97 (1974); 56 Am.Jur.2d *Municipal Corporations, Counties and Other Political Subdivisions* § 680, at 725 (1971). It may be that, as applied to municipalities, notice provisions meet even the majority's overly restrictive definition of "universally familiar procedural aspects of litigation." I do not belabor that point, however, for it is clear that such provisions, like statutes of limitations, meet a widely felt need in litigation and that federal constitutional com-

mon law is "deficient," in the technical sense at issue here, in not having one.

### 2.

Statutes of limitations and notice-of-claims provisions serve many of the same policies. For example, what the majority quotes Justice Rehnquist to say about the former applies with equal force to the latter.

The process of discovery and trial which results in the finding of ultimate facts for or against the plaintiff by the judge or jury is obviously more reliable if the witness or testimony in question is relatively fresh. Thus in the judgment of most legislatures and courts, there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the fact-finding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious.

*Tomanio*, 446 U.S. at 487, 100 S.Ct. at 1796. *See Burnett v. New York Central R.R.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965), *quoting Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944) ("Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared....'").

The majority agrees that "Congress was clearly concerned with ensuring the freshness of evidence when it passed 12 D.C. Code § 309," maj. op. at 1506, and that therefore this provision shares at least something in common with statutes of limitations. But the majority fails to see that section 12–309 fulfills another, very important purpose of the statute of limitations— that of defining "the point of repose ... after which expectations become settled." Maj. op. at 1506. Section 12–309 gives the city assurance that, if it has learned of only certain claims for the prior six months, it may proceed in the settled expectation that there are no additional outstanding poten-

tial liabilities. Knowing its potential exposure, the city may then deal, by investigation, settlement, or litigation with the population of claims as to which it has received notice.

Like statutes of limitations, notice-of-claims provisions go primarily to the remedy. 56 Am.Jur.2d, *supra*, § 691, at 733. Basically, both involve a legislative "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Railway Express Agency,* 421 U.S. at 463–64, 95 S.Ct. at 1721–1722.[7] According to the majority, however, section 12–309 is not part of any remedial scheme, but rather "add[s] elements to [a] federal right[ ] of action." Maj. op. at 1508, *citing Gwinn v. District of Columbia,* 434 A.2d 1376 (D.C.1981) (holding that section 12–309 is a condition precedent to the accrual of rights against a municipality). Changing the characterization of the notice statute does not change the reality with which we should deal: the purpose of the statute and the policies it serves. It would be just as easy to say that filing within the period mandated by the statute of limitations is a condition precedent to maintaining an action for tort damages; that would then appear to add an element to a federal right of action. But this is merely playing with words. The point is that section 12–309 serves the same purpose as a statute of limitations, and that requiring notice within six months is no more "burdensome" on

federal interests than is mandating filing within a limitations period. A notice-of-claims provision goes to the remedy in the same way that a statute of limitations does. Any attempt to view it as an element of the cause of action is logically indistinguishable from viewing a statute of limitations that way, too.[8]

3.

Notice-of-claims provisions, like the District's section 12–309, are an adjustment of interests that produces a very fair result. The municipality's need for notice is clear. As the New York Court of Appeals has pointed out:

> Requiring notice allows a governmental subdivision a meaningful opportunity to investigate in a timely manner the circumstances that gave rise to a claim. The requirement of notice is one of the safeguards devised by the law to protect municipalities against fraudulent and state claims for injuries to persons and property.

*Mills v. County of Monroe,* 59 N.Y.2d 307, 310–11, 464 N.Y.S.2d 709, 711, 451 N.E.2d 456, 458, *cert. denied,* —— U.S. ——, 104 S.Ct. 551, 78 L.Ed.2d 725 (1983) (citation and interior quotation marks omitted).

A municipality needs a notice period that is shorter than the ordinary statute of limitations. For one thing, given the very wide range of services and facilities used by the public that a municipality provides, a municipality has many more ways of injuring

---

7. This conclusion is supported by the frequency with which federal courts look to notice-of-claims provisions to establish the limitations periods where there is no directly applicable statute of limitations. *See, e.g., Delcostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 2287–90, 76 L.Ed.2d 476 (1983). *Cf. Zipes v. Trans World Airlines,* 455 U.S. 385, 393–96, 102 S.Ct. 1127, 1132–1134, 71 L.Ed.2d 234 (1982).

8. That the D.C. Court of Appeals has understood the notice requirement of § 12–309 to be a condition placed on the partial waiver of the District's sovereign immunity is irrelevant, primarily because it is wrong. The District of Columbia has no sovereign immunity from liability for the non-discretionary acts of its employees which violate the Federal Constitution and laws.

*Owen v. City of Independence,* 445 U.S. 622, 647–48, 100 S.Ct. 1398, 1413–1414, 63 L.Ed.2d 673 (1980). *See Dellums v. Powell,* 566 F.2d at 229. Having no immunity, the District of Columbia has nothing to waive, and cannot be said to be offending federal law by placing a condition on a waiver of something it does not have. Moreover, the legislative history contains no mention of sovereign immunity. It does not matter, in any event, whether or not one thinks of § 12–309 as a waiver of sovereign immunity. The conceptual origin of the provision is irrelevant given the clear evidence that Congress intended a notice-of-claims provision and could legislate that provision in any way it wished. The concept of sovereign immunity has nothing to do with this suit.

persons or property without knowing that it has done so than does any particular agent of the municipality or any individual or business. Because of the extensive and segmented bureaucracy that the provision of so many and so varied services and facilities requires, a city, particularly a major city like Washington, D.C., will often not receive timely and adequate notice of a likely claim from its own employees, even assuming that there is an employee who knows of a likely claim. The one person who is sure to know is the individual who thinks the city has in some tortious way injured his person or property. It makes eminent good sense, then, to require notice to the city within six months so that the facts may be investigated before they go stale, good claims paid, marginal claims compromised, and worthless claims shown to be such.

On the other hand, section 12–309 does not burden the claimant in his preparation for litigation. He need not prepare the facts and pleadings necessary to litigation within the six-month notice period. He need only give notice of "the approximate time, place, cause, and circumstances of the injury or damage." A handwritten note will do, or, as the statute provides, a police report of the incident. After that, the claimant has the full period of the statute of limitations to file his claim in court, if the claim has not been settled.

It is apparent, then, that section 12–309 applies many of the policies of a statute of limitations to the special needs of a municipality, but does so with the minimum burden on the litigating needs of the claimant. It is ironic that, at least under the majority's analysis, the statute would have had a better chance of being borrowed and applied if it were a true statute of limitations, and hence more burdensome to the assertion of rights in court, rather than a notice provision serving the same purposes less harshly.

### B.

The appropriateness of applying section 12–309 to this lawsuit may be shown by applying the analysis followed by the Supreme Court in the recent case of *Burnett v. Grattan*, —— U.S. ——, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). There the Court decided in the negative the question "whether a state law, establishing a procedure for administrative resolution of employment discrimination complaints, provides an appropriate statute of limitations for actions brought under the Reconstruction-era Civil Rights Acts, 42 U.S.C. § 1981 *et seq.*" *Burnett*, at ——, 104 S.Ct. at 2926. Respondents Grattan and Hedman, white employees of a predominantly black college in Maryland, were told their contracts would not be renewed because of dissatisfaction with their work. They filed a suit against various officers of the college, alleging racial and gender discrimination. The district court dismissed the suit as barred by the applicable statute of limitations, Md.Ann. Code, Art. 49B, § 9(a). Because there was no limitation period provided by the federal statutes, the court borrowed a six-month limitation period from a state statute prohibiting discriminatory practices in employment. The court of appeals reversed, holding that a three-year statute of limitations should be chosen.

The Supreme Court affirmed because "functional differences" between the federal causes of action and the state administrative law made Article 49B an inappropriate statute of limitations to borrow. At ——, 104 S.Ct. at 2928. "A state law is not 'appropriate,'" the Court said, "if it fails to take into account practicalities that are involved in litigating federal civil rights claims and policies that are analogous to the goals of the Civil Rights Acts." *Id.* at ——, 104 S.Ct. at 2930. The Court's analysis of the "functional" characteristics and "practicalities" involved demonstrates the appropriateness of borrowing section 12–309 for litigation against the District of Columbia.

The Court set out the characteristics of the federal law with which the characteristics of the state law were to be compared.

In the Civil Rights Acts, Congress established causes of action arising out of

rights and duties under the Constitution and federal statutes. These causes of action exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable in the first instance. The statutes are characterized by broadly inclusive language. They do not limit who may bring suit, do not limit the cause of action to a circumscribed set of facts, nor do they preclude money damages or injunctive relief. An appropriate limitations period must be responsive to these characteristics of litigation under the federal statutes.

At ——–——, 104 S.Ct. at 2930.

The Court began "with the observation that borrowing an administrative statute of limitations ignores the dominant characteristic of civil rights actions: they belong in court." At ——, 104 S.Ct. at 2930. This meant attention to the complexities of preparing and initiating litigation and to the responsibilities that follow hard upon filing, such as being prepared to cope with motions and discovery. By contrast, under Maryland's administrative scheme, a complainant had merely to make and sign a complaint under oath and file it with the state's Human Relations Commission. *Id.* The complaint need contain only the name and address of the person or entity alleged to have discriminated and the particulars of the discrimination. The Supreme Court said that

> [w]hen a legislature selects a statute of limitations to govern a particular cause of action, it takes into account the burdens borne by the parties to a suit of that sort.... The time limit established by the Maryland legislature reflects in part the minimal burden state law places on the administrative complaint, which does not correspond in any significant way to the substantial burden federal law places on a civil rights litigant.

*Id.* (footnote omitted). This legislative recognition of the difference led the legislature to choose a six-month limit for filing a grievance but gave the Human Relations Commission, which assumed the role of a litigant upon receiving a complaint, an additional two years in which to investigate, negotiate, settle, or bring formal charges against an employer.

The parallels to the statutory scheme provided by Congress for the District of Columbia are obvious—and those parallels all lead to the conclusion that here the borrowing is entirely appropriate. I will trace the application of the Supreme Court's rationale to this case.

The tort claims governed by section 12–309, like claims brought under federal civil rights statutes, "belong in court." To use *Burnett*'s criteria, both are judicially enforceable in the first instance; both are characterized by broadly inclusive language; neither limits who may bring suit; neither limits the cause of action to a circumscribed set of facts nor precludes money damages or injunctive relief. The tort claimant in the District of Columbia, if he must comply with section 12–309, at that stage bears none of the burdens of a litigant. Even if a police report has not relieved him of any obligation, the notice a plaintiff must file within six months is less burdensome than the sworn complaint the complainant must file within six months with Maryland's Human Relations Commission. The Court noted that, as a litigant, the Human Relations Commission had an additional two years to act. In our case, once the notice is filed, the torts claimant, under the facts here, has an additional two-and-one-half years to investigate, negotiate, settle, or sue. Congress has taken into account the differing burdens involved in filing a notice and preparing for litigation and provided appropriate time periods for each.

The Supreme Court also rejected the six-month administrative time limit in *Burnett v. Grattan* because

> [t]he divergence between the goals of the federal civil rights statutes and of the state employment discrimination administrative statute is clear in the present case. The goals of the federal statutes are compensation of persons whose civil rights have been violated, and prevention

of the abuse of state power. *Board of Regents v. Tomanio*, 446 U.S., at 488 [100 S.Ct. at 1797]; *Robertson v. Wegmann*, 436 U.S. 584, 590–591 [98 S.Ct. 1991, 1995–1996, 56 L.Ed.2d 554] (1978). That these are not the goals of the statute empowering Maryland's administrative agency to resolve employment discrimination complaints is apparent both because the remedial authority of the agency is limited, and because the state scheme does not create a private right of action. The stated goal of the state administrative procedure is the prompt identification and resolution of employment disputes. The administrative scheme, including a short statute of limitations, encourages conciliation and private settlement through the agency's intervention in live disputes.

*Id.* at —— ——, 104 S.Ct. at 2931–2932 (footnotes omitted).

Here, section 12–309 aids the prompt identification and resolution of disputes but it does not set a short time limit on the right to file suit. Appellant in this case had three years to file suit. Taken together, then—as they must be if "functional" characteristics and "practicalities" are to be compared—section 12–309's six-month notice period and the three-year statute of limitations applicable to appellant Brown have the same distribution of burdens and benefits as those the Court thought appropriate in *Burnett*. Six months is appropriate for a notice provision, but a longer period—there an additional two years, here an additional two-and-one-half years—is appropriate for a limitation on the filing of litigation because the burdens of initiating litigation are much greater than those of filing a notice. Under the rationale of *Burnett*, Congress behaved entirely correctly in enacting section 12–309 as a notice period and three years as the statute of limitations. There can be no doubt that section 12–309 is an "appropriate" notice period to borrow.

### C.

Having demonstrated that federal law is deficient under either of the two possible definitions of "deficiency" and that six months is an appropriate period to borrow, we need only consider whether section 12–309 is inconsistent with federal law. *See supra* p. 1501.

The Supreme Court has identified four policies for a federal court to consider in deciding whether to borrow a local procedural rule serving the policy of repose: deterrence, compensation, uniformity and federalism. *Chardon v. Soto*, 103 S.Ct. at 2616. None of these policies would be offended by the application of section 12–309.

I note at the outset the Supreme Court has often stated that "[a] state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation. If success of the § 1983 action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be the one favoring the plaintiff, and its source would be essentially irrelevant." *Robertson v. Wegmann*, 436 U.S. at 593, 98 S.Ct. at 1996. *See id.* at 594–95, 100 S.Ct. at 1997–1998 ("[T]he mere fact of abatement is not sufficient ground to declare state law 'inconsistent' with federal law."). We must, therefore, consider the specific effect of section 12–309 on each of these four policies.

Neither the policy of deterrence nor of compensation would be undercut by application of 12–309 "since plaintiffs can still readily enforce their claims, thereby recovering compensation and fostering deterrence, simply by" providing notice of their claim within six months. *Tomanio*, 446 U.S. at 488, 100 S.Ct. at 1797. *Cf. Burnett v. Grattan*, —— U.S. at ——, 104 S.Ct. at 2930 (noting the minor "practical difficulties" facing those who need only make, sign and file a complaint within six months). Similarly, there is no need for uniformity here. The Supreme Court has repeatedly refused to put aside state law for the sake of formulating or applying uniform federal rules in civil rights actions. For example, in *Tomanio*, the Court said

that "[t]he need for uniformity, while paramount under some federal statutory schemes, has not been held to warrant the displacement of state statutes of limitations for civil rights actions." 446 U.S. at 489, 100 S.Ct. at 1797. And in *Robertson v. Wegmann,* the Court held

[W]hatever the value of nationwide uniformity in areas of civil rights enforcement where Congress has not spoken, in the areas to which § 1988 is applicable Congress has provided direction, indicating that state law will often provide the content of the federal remedial rule. This statutory reliance on state law obviously means that there will not be nationwide uniformity on these issues.

436 U.S. at 594 n. 11, 98 S.Ct. at 1997 n. 11. *See Chardon v. Soto,* 103 S.Ct. at 2619.

Finally, applying section 12–309 does not impede the goal of federalism. The policy of repose served by the Act is important to the federal as well as the state system. *Tomanio,* 446 U.S. at 488, 100 S.Ct. at 1797. As pointed out above, *see* p. 1514, *supra,* this statute ensures freshness of the evidence and helps prevent against unreasonable claims. It promotes justice. *Burnett v. New York Central R.R.,* 380 U.S. at 428, 85 S.Ct. at 1054. It is not unreasonably short. Indeed, many other civil rights statutes have a similar, and sometimes shorter, notice requirement. *See, e.g.,* statutes cited in note 4, *supra.*

Nor is the goal of federalism offended by borrowing a statute that applies only to a governmental entity. In *Aitchison v. Raffiani,* 708 F.2d 96, 100–03 (3d Cir.1983), and *Kosikowski v. Bourne,* 659 F.2d 105 (9th Cir.1981), the Third Circuit and the Ninth Circuit borrowed limitations periods from state tort claims acts. The Third Circuit held that

[i]t is not unreasonable for a state to assume that the public interest in the repose of claims against a governmental agency is worthy of special consideration. Also, the problem of preserving

evidence may be more difficult when the defendant is an elected body whose members serve relatively short terms.

708 F.2d at 103. Here, Congress made that assumption and determined that the District of Columbia has a right to be notified of claims to be brought against it within six months.[9]

That the purpose of constitutional tort claims is to augment remedies against government subdivisions and officials does not mean that notice provisions are inconsistent with federal law. As the majority states, some limitation of remedy is always necessary. Therefore, especially where the policies a state law serves are so close to those of a statute of limitations and where the time period is not inappropriate, absent any congressional direction, federal courts ought not to substitute their own judgment for that of the state legislature.

The policies permitting recovery for constitutional torts do not require that we apply only the farthest reaching remedy. Both Congress—in enacting section 1988— and the Supreme Court have made clear that state law is to be our "primary guide" in this area. *Johnson v. Railway Express Agency,* 421 U.S. at 465, 95 S.Ct. at 1722. I dissent today because the majority ignores that injunction as well as Congress' express language and purpose in enacting . section 12–309. I believe the grant of the District's motion for summary judgment should be affirmed.

---

9. The fact that Congress and not a state legislature enacted § 12–309 is of course not dispositive in the context of the federal borrowing doctrine, if the District of Columbia's provision is treated as a state law.